HARRIET M. CLOSZ, Appellee, v. THEOBALD CLOSZ, Appellant.

DIVORCE:  Cruelty.  Evidence reviewed, and held sufficient to jus-
1  tify decree of divorce in favor of the wife, notwithstanding a
measure of blame on her part.

DIVORCE:  General Allegation of Cruelty.  A general allegation of
2  cruelty, in the absence of attack thereon, is sufficient.

DIVORCE:  Standard for Measuring Alimony.  In awarding alimony
3  to a wife, due consideration will be given:
(a) To the extent to which the wife has been instrumental
in the joint accumulation of the property;
(b) To the relative degree of blame attributable to each of

the parties, as reflected in their entire conduct towards, each other; and

(c) To the *resources* of the parties, rather than to the wife's necessities.

Record reviewed, and allowance of $16,000 reduced to $12,000.

**APPEAL AND ERROR:** Correction of Abstract and Resort to Transcript. Transcripts will be resorted to only in case of proper denial of abstract. It follows that pretended corrections of the record will be wholly disregarded, when inserted in reply arguments.

*Appeal from Hamilton District Court.*—ROBERT M. WRIGHT, Judge.

OCTOBER 25, 1918.

The appellee obtained decree of divorce and allowance of alimony and an award of attorney fees. All these actions are complained of on this appeal.—*Modified and affirmed.*

*Wesley Martin* and *G. D. Thompson,* for appellant.

*F. J. Lund* and *D. C. Chase,* for appellee.

SALINGER, J.—I. Many of the complaints are petty. They include, for instance, deprival of church privileges. There is no substantial evidence of such deprivation, and, on the other hand, it appears clearly that plaintiff severed all church connections, and was practically anti-church. Her statement, "I do not know that I found fault because he wouldn't allow me to attend church,—I just took it he was the head of the house," is illuminative. And the further statement that she is not a church member, not opposed to church, but is opposed to a system of Christianity "the way it is administered nowadays. I don't believe in the doctrine of Christianity at all. I used to believe in it, but he shook my belief, and he was the first man that put a doubt in my mind." The condition of the proof on ex-

cessive sexual demands is in like case. And the alleged refusal to give medical aid resolves itself into the belief of the defendant that chiropractors' treatment was a fake. The revolver incident is petty. It simmers down to no threat of any kind, literal or figurative. There are too many for detailed consideration.

II.    But the plaintiff is corroborated in her claim that, on May 18, 1914, her husband made a physical assault upon her of such gravity as that it made her too lame to go to town for several days; that her eye or eyes were badly discolored; that five days afterwards, she was nursing a black eye, and her face was black and blue under her eyes. Neighbors who came in when this assault was finished, found him white-faced and shaking, as if with anger, and speaking as though he was angry; they found the woman crying, and lying on the floor and rubbing her ear as though it was badly hurt; they heard a disturbance, before going in, that sounded as though chairs were going over the floor, and were of opinion that the parties were having trouble. They heard loud talking, and heard the woman scream, and then ran in. There is testimony—and it is corroborated— of physical violence, many times in the past, although most of it was not of as serious a character as the last. Marks on the person of plaintiff seem to have been of not unfrequent occurrence. Marks on her arms, where defendant pinched her, seem to have endured three and four weeks. She had a black neck from his choking her with his hands, about Thanksgiving Day, 1913. At one time, there was a blackened hip, "hurt bad." According to defendant, he at one time just tapped her with the back of his hand. On his more detailed account, it seems to have been a striking her right on the mouth. The explanation is, however, that this was done when she started with both arms to come at him "a second time." According to plaintiff, her husband

1. DIVORCE:
   cruelty.

has threatened to pound her head into a jelly if she told of his conduct towards her. We are not overlooking that these other acts of violence are denied, and that there is an attempt to explain the last act. In our opinion, the explanation tends rather to corroborate the plaintiff than to dispute her. That is to say, it is not a reasonable explanation, in the light of all the evidence concerning both that act and others preceding it. No one may read this record impartially, and hold that the plaintiff was in all respects a model wife. It may fairly be said that she fell below the average in meeting her marital duties. That fact will have consideration on alimony; but in our opinion, it did not justify the conduct of the defendant,—was not, in reason, an adequate provocation for it; and there is competent evidence that it was highly injurious to the health of the plaintiff. And the decree has other support.

We think that the charges of unchastity made by the defendant are unduly emphasized, and repeated without tangible warrant; and this is applicable to the claim that plaintiff was suffering with venereal disease, and to the claim that she asked her husband to have sexual relations with female guests, as a matter of hospitality. It has some bearing on the wrongful accusations that, on pressure, the defendant confesses to at least one adultery on his part. His statements as to her relations with a certain taxidermist are illustrative, it being finally developed that defendant never had a suspicion there was any undue intimacy. The cross-examination brings this about as to other charges, and it is all fully denied. He injected hints of unchastity on information from his own brothers, and he made neither of the brothers a witness.

He used injurious epithets as to herself and her family, though some of those were, perhaps, jocular. Others cannot be put in that class. They include "whore" and "bitch," "damned fool," "degenerate," "damned louse," aspirations

that she was in hell, and general swearing at her, and statements that she "didn't know anything." "Liar" and "fool" were very common, and statements that she was "crazy" and an "idiot." His denials are illuminative. One is that, "to my recollection, I never called her a bitch or a whore."

We do not overlook the tendency to color, in divorce cases. *Pooley v. Pooley,* 178 Iowa 19. And we do not agree to the argument that *Evans v. Evans,* 159 Iowa 338, holds that a finding by the trial court, having the witnesses before it, will not be disturbed on appeal, if sustained by evidence. This is not the rule governing hearing *de novo.* But, on the whole record, we find that a divorce was due plaintiff. We do so without much help from case law, cited by the parties, such as *Shook v. Shook,* 114 Iowa 592; *Pooley v. Pooley,* 178 Iowa 19, *Martin v. Martin,* 150 Iowa 223, *Shors v. Shors,* 133 Iowa 22, and *Turner v. Turner,* 122 Iowa 113, relied on by the appellee; and the *Shors* case, supra, *May v. May,* 108 Iowa 1, *Edgerton v. Edgerton,* 79 Iowa 68, *Prather v. Prather,* 99 Iowa 393, *Blair v. Blair,* 106 Iowa 269, *Vanduzer v. Vanduzer,* 70 Iowa 614, and *Carlisle v. Carlisle,* 99 Iowa 247, which is the battery for the appellant. Essentially, each divorce case presents a fact question, and other cases are, in the very nature of things, variant in some one or more vital particulars.

It is argued that, under *Freerking v. Freerking,* 19 Iowa 34, the allegations of inhuman treatment may not be general; inferentially, that they were so here. If that be so, objection should have been taken to the 2. DIVORCE: general allegation of cruelty. petition, and may not be now raised for the first time. As to the related claim that, because of this generality, the court erred in allowing matters other than those charged in the petition to influence its decree, the answer is that a general allegation in pleading, not duly objected to, will warrant equally general proof. We have to say, further, that, if all

be eliminated that might be claimed to be inadmissible for any reason, enough remains to move us to affirmance of the divorce decree.

III. The court found, and we think rightly, that defendant has property as follows:

3. DIVORCE:
standard for
measuring ali-
mony.

|  |  |
|---|---|
| Land | $32,400 |
| Certificate of Deposit | 1,581 |
| Cash subject to check | 1,130 |
| Two engines | 200 |
| Automobile | 400 |
| Promissory note | 505 |
| Homestead in city | 5,100 |
| Personal property | 1,500 |
|  | $42,816 |

Take out the land, the engines, the automobile, the homestead, and the "personal property," none of which are cash or instantly convertible into cash, and there remains $3,216. And if it be assumed that the land should be treated as a cash resource, we have resources amounting to $35,616. The decree orders defendant to pay plaintiff $16,269.71 in cash. It lets her keep lands of her own, found to be worth $3,340, and assesses defendant $600 for plaintiff's attorney. The allowance is not the income from the $16,000. That would cease at her death, and possibly on her remarriage. The total sum is sequestrated, which, in a sense, grants the income from such sum in perpetuity. We are constrained to believe that this is more than is prayed—because more than "just and equitable." Nothing in the evidence shows a relative or comparative condition that calls for an extraordinary allowance. The man weighs more than the woman, and she has rheumatic trouble. But he is not what he once was, either, either in health or earning capacity. Assume the wife needs all she got, and that is not decisive. The allowance must be regu-

lated by resources, rather than by necessities. *Evans v. Evans,* 159 Iowa 338. There is nothing in the record that gives plaintiff a standing above the average aid that a wife is in accumulation. In fact, a good part of the time while the husband was doing his largest earnings, the parties lived apart, and she was being maintained at a distance. When he could come home, she wanted him to do the washing, and all the extra work it made for her.

The relative or comparative fault of the parties is material. *Zuver v. Zuver,* 36 Iowa 190. True, we have found that no fault of the wife so justified the husband as to leave the decree for divorce without sufficient support. Notwithstanding that, her conduct has bearing upon what is equitably her due upon a divorce which there might have been no occasion for, had she done her full duty as a wife. When we reach the question of whether an inequitable provision has been made for the divorced wife, her conduct becomes material, even though, despite her conduct, the decree granting her divorce will not be disturbed. Now while, as said, there was no warrant for defendant's charging the plaintiff with unchastity, there was, however, enough in her conduct with other men to sustain our view that, when it comes to alimony, she hardly measured up to the standard of a dutiful wife, and that she persisted in associations, though objection was made, which she should never have entered into, or have abandoned. The brakeman Terrelegar, a man of unsavory reputation, is one of the instances. While there is no evidence of actual unchastity, there is much to show that the wife was inclined to be a propagandist for free love theories, and to remain in close association with fellow advocates, both male and female.

She made it a more or less constant object of criticism that he abandoned his position in Chicago, where she said he was drawing a salary of $4,800, being influenced by the thought that it wouldn't hurt them if they had a little more money, and that she didn't think they had enough to retire

on. She confesses there may have been words several times about his quitting that position, which was a road position. He says she constantly nagged him about it, though. he quit because of ill health.

She acted in resistance, both physically and by word of mouth. She admits, in effect, talking back and striking back, although she says it was all purely defensive. On the whole, the testimony does not quite show that it was purely defensive.

In *Barr v. Barr*, 157 Iowa 153, 157, it is indicated that, if the net value of the property was but $15,000, an allowance of $5,000 would be excessive. In *Arment v. Arment*, 154 Iowa 573, plaintiff was given the custody of two minor children; the husband was worth from $20,000 to $25,000. The plaintiff was given $500 temporary alimony and $7,500 permanent alimony. On appeal, the permanent alimony was reduced to $5,000. In principle, the case of *Halley v. Halley*, 130 Iowa 683, amounts to holding that the allowance at bar is excessive. So of *Hartl v. Hartl*, 155 Iowa 329.

In our opinion, an allowance of $12,000 is quite as liberal as the equities of the case will sanction. The decree will be accordingly modified. The allowance of the attorney fee will be affirmed. Appellant will pay all costs.

We have no occasion to consider whether a deposition taken for the defendant should have been suppressed, since the plaintiff is victorious, despite such deposition.

IV. The reply calls our attention to pages in the transcript, and makes efforts to correct the record. This may not be done in the reply, and neither will the transcript be resorted to in any event, except 4. APPEAL AND as a conflict is raised between the abstract ERROR: correction of abstract and re- and its denial. This cause must be determined upon what the two abstracts present. —*Modified and affirmed.*

Preston, C. J., Ladd and Evans, JJ., concur.