CATHERINE O'NEILL, complainant,

*v.*

JOSEPH L. O'NEILL, defendant.

[Decided August 25th, 1939.]

*Messrs. Melosh, Morten & Melosh, (Mr. Louis G. Morten),* for the complainant.

*Messrs. Solomon & Miller (Mr. Abraham Miller),* for the defendant.

VAN WINKLE, A. M.

1. On this appeal, I am called upon to give my reasons for the Chancellor's order of August 25th, 1939, made by him on my advice. First, I notice that counsel have made a stipulation of facts, which shows the salary and secured debts of the husband on two specified dates, and that, apparently, this stipulation is looked upon by counsel for the wife, as all that needs to be considered in connection with the petition of the complainant for an increase of support on this appeal. There are many other significant things not at all in any way reflected in this stipulation or contained in the complainant's petition which I considered and which influenced me in the making of the order appealed from. Some of these things could hardly be expressed in a stipulation although they were facts. This appeal was not taken until near the end of the three-months appeal period; but I have before me the files, not only the file of this suit, but also the file of a previous maintenance suit between these parties (Docket 98, page 353), my fragmentary notes made at the time support was fixed by the decree in this suit—and I have my memory.

It would take much writing to tell about all the things that properly had significance when I advised the order that has been appealed from. Some of these things are referred to or discussed herein, and I think sufficiently, but none of these things, except only the husband's salary and proved debts, appear in the stipulation. I may say here, for example, and this is a very important thing, that on the same day the

order appealed from was made, another order was advised by me under the decree made nearly five years before in the previous maintenance suit between these same parties, relating to vested arrearages under that decree.

The bill filed in this previous suit in September, 1933, disclosed that there had been theretofore eight proceedings in the domestic relations court, all having to do with the failure of the husband to pay toward the support of the wife; and it was alleged in the bill that the husband had abandoned the wife in January, 1930. The bill in the previous suit did not allege any cruel treatment, nor did the second bill, which was filed in March, 1938. Subsequently to the decree in the previous suit, made February 28th, 1934, contempt proceedings were brought more than once. Eight months after the first decree was made the husband was in arrears to the amount of $800, and at that time there were contempt proceedings based on these arrears. There were many promises to pay and continuances on orders which were made. There was an order for an execution. The parties got together some time after the decree in the first suit was entered, in a conditional and not fully consummated way as set forth in the second bill, but there was no reconciliation, as I understand, and upon the husband again leaving the wife the second bill for maintenance was filed. There was a contempt proceeding initiated under the first decree in August, 1938, and another in June, 1939. Contempt proceedings under the decree in the first suit and also under the decree in the second suit were before me contemporaneously several times on applications of the wife; and it clearly appeared that these applications needed to be dealt with together if my action was to be at all sensible and practical. New counsel came in for the husband. The defendant himself was before me a number of times in these contempt proceedings; and more than once I addressed him directly in strong language and warned and admonished him. An order authorizing a warrant for his commitment to jail was signed under the second decree in September, 1938. If a warrant had been immediately issued the husband would have lost his job and nothing would have been produced for the wife.

By signing the two orders on August 25th, 1939, one in the previous suit, and the other in the second suit which is the one appealed from, I got matters to what appeared to be a conclusion. I acted with practicality, and in the light of realism. I advised the two orders in part on the promise of the defendant, backed by the agreement of his new counsel, that he would assign a part of his salary, received by him as an employe of the city of Jersey City, to his wife, that the collectibility of amounts due and to come due to her under the second decree might be better assured to her. I then stated in open court that if the husband would execute such an assignment, I would not grant the application of the wife for an increase in the amount of support provided for her in the second decree. Each of the orders signed August 25th, 1939, had a bearing on the other. Both came out of the situation then existing. They involved the same thing, the wife's support, and they need to be considered together. They hardly can be considered separately.

Judgments were entered against the husband in favor of "banks," "loan companies," "finance companies," "investment companies" and individuals, from time to time. I heard some new names. And he had made assignments of his salary, or parts thereof, voluntarily, and also under pressure. His salary was garnisheed, and he had general creditors from whom I heard from time to time. These creditors are not mentioned at all in the stipulation. Of course I needed to consider the judgments and assignments, for there was no proof of fraudulence, and the judgment creditors and the assignees were not parties to the proceedings before me.

This husband has been an undesirable husband over a long period, so far as money support for his wife was concerned, and he has been an undesirable debtor for third parties. He has been a difficult litigant; he has evaded service of papers; he made promises to the court that were not kept. But I had no right to increase the amount of support to be paid to his wife because of these things and thus punish him for them. However, I noticed all these things, and also I considered the apparent future difficulty of collecting from him under any decree or order, and I ascertained, as judges of this

court so often do in matters of this kind, that putting him in jail as for a contempt, would destroy the source of his income. After all, a civil contempt proceeding is but a step in a cause. It is a collection proceeding. I realized that a failure to pay a greater sum than that provided by the decree probably would not result from contumacy, but from inability to pay. So, acting sensibly and realistically, I suggested the assignment of a part of his salary, of which assignment I have spoken; and thus, while nothing was added to the provision for payment in the decree in dollars and cents, that provision was given an additional value for the wife. These were some of the circumstances, and this was the kind of man I had before me when I advised the two orders of August 25th, 1939.

My notes, made at the time the second decree was made, indicate that, counting the amount for support provided for the wife as being received by her, and including her wages and income and the husband's salary and his secured debts to the extent that periodic installment payments were being necessarily made thereon, and leaving out of consideration his general indebtedness, the amount of which was not proved before me, the money result of the estimation for support was about $45.50 a week for the husband and about $41 a week for the wife. And, having in mind that the distinct objective in an alimony or support proceeding is the proper support of the wife, I could see no reason why the wife was entitled to have more from the husband by an order of this court, and I felt she could not collect more. The wife overlooked the right of the husband to discharge, in whole or in part, some or all of his secured debts by making payments in excess of the installment amounts arranged for. And the general creditors of the husband, about whom I heard from his counsel from time to time on the different hearings, were entitled to consideration. These parties had been in litigation many years over this one question, the support of the wife; and I considered the many difficulties that had been encountered, in collecting the amounts provided for support, the motions, the continuances, the contempt proceedings, the arrearages under the first decree, the husband's many broken

promises, and that sending him to jail for contempt, should I determine he was contumacious, would undoubtedly result in his discharge from his employment and the public would be compelled to support him. I sized up the whole situation. I knew that I should not be acting with common sense if I considered only the husband's salary and his secured debts for the payment of which in installments it was claimed he had arranged. An order for the payment of money should not be a futile one. It should be made for amounts that are collectible with reasonable promptness. Many orders for alimony which have provided for what later turned out to be excessive amounts have arisen to plague the courts and the parties, as the judges of this court well know. Looking at an old report, I find Dr. Lushington speaking on this head: "In decreeing alimony in 1813 I have some recollection that Lord Stowell, upon being pressed to give a larger sum, observed that if he could think that the wife would be able to obtain it, he would make a more ample allowance, but that the allotment of two hundred pounds a year he considered would be more beneficial to her. And the difficulties she is stated to have experienced in respect of her alimony seem to bear testimony to the propriety of that decree."

It was not contended at the time the order appealed from was advised that the wife was in need. She then was well employed, as she had been for a long time, by one of the large corporations of the country, and she had some additional income. But the wife thought that she was entitled to an increase, because, as her counsel orally contended, "the husband was the guilty party, and the wife's wages and income should not be considered at all by the court, because that would be a rewarding of the husband;" in short, that the order for support should be a punishing order because the decree had gone against the husband. How counsel will formulate his contentions on this appeal I do not know, but I remember that he stated that our court of errors and appeals had not passed on the points involved in his contentions as I have just stated them, but I am constrained to say that my understanding is to the contrary.

There was no appeal from the amount of support provided

in the decree in the second suit made May 11th, 1938. This appeal is only from the order made under the second decree which dismisses an application for increase in the amount of support provided by the second decree.

Knowing counsel's contentions one may understand why he regards the bare stipulation that I have spoken of as an entirely sufficient base, in connection with the wife's petition for an increase, for a consideration of this appeal by our court of errors and appeals.

As this appeal opens the whole subject of alimony and support, and as my duty and my desire are to express my several reasons for advising the order appealed from with decent completeness, these conclusions are longer than they would be if only one point needed to be considered.

2. We find in the opinions of the courts, when the parties to a matrimonial suit are designated, the words "guilty husband," "innocent wife," and other words of similar import. But these words are only designating or descriptive words, and they do not have, nor should they be held to have, any meaning or any implication affecting the amount of alimony to be allowed by this court in a divorce suit or the amount of support in a maintenance suit. I notice that the words "innocent wife" are used in an opinion of our court of errors and appeals in a case decided this year, but they are used only to distinguish the wife as the party who obtained the decree in the suit in which the opinion came. These words that I have mentioned and referred to are not used with any intent that our courts do punish, or that our courts have any right to punish, a husband, because a decree of divorce or of maintenance is in his wife's favor. These words have come down to us from the ecclesiastical courts, where questions of moral delinquency were dealt with; but the decisions of those old courts, while interesting, have now no importance other than historical. Alimony law has an historical background, but in this country it has a statutory structure. More than fifty years ago our court of errors and appeals adopted an opinion of Vice-Chancellor Van Fleet in which he said: "This court can give nothing by way of punishment;" and the case he was then deciding was one where the

facts were severely against the defendant husband who was morally delinquent. In a reported case, and in unreported cases, in this court, it has long been held that "excessive alimony cannot be awarded by way of punitive damages to penalize a defendant for extreme cruelty to his wife." These words that I have mentioned, and other similar words, themselves have not any importance, nor have they any consequences, in a monetary way, on applications for alimony or support, nor have the situations which these words indirectly describe, any importance or any consequences bearing on the amount of alimony or support which should be ordered or decreed.

Our court of errors and appeals has held that "our courts interfere on the ground of cruelty to prevent future harm rather than to punish the offender for what he has done." And, as an order for alimony is made only because of the making of a decree of divorce, the order is not to be a punishing order, because the decree is not a punishing decree. A husband who is a good father to his children may blunder into adultery. But adultery is one of "the shalt-nots" of the Decalogue, and this has enhanced its comparative importance in matrimonial litigation. In this court adultery must be proved as a crime is proved, that is, beyond a reasonable doubt. A brutal wife-beater may be considered by the court on an application for alimony to be a baser man than an adulterous husband, the facts of particular cases being considered. A despicable deserter of a frail helpless wife and little children may be, on such an application, considered to be as morally bad as an adulterous husband. If we go into these questions, if we seek to punish a "guilty" husband on an application for alimony, by giving more because he is "guilty," we need to deal with moral questions, when our endeavor should be only to provide for the wife's needs to the extent of the husband's ability. And punishing orders, that is, orders for excessive amounts, are usually futile, and, of course, futile orders should not be made.

It would be untrue, however, to say that the emotional reactions of judges to states of facts severely against "guilty" husbands have not been of influence in cases appearing in the

reports, and have not increased the amount of alimony or support, especially when the orders or decrees have followed closely on a hearing on the merits of the divorce or the maintenance issues. And it cannot be denied that, judges being human, excessive amounts of alimony or support have sometimes been allowed in cases with facts severe against husbands. Our court of errors and appeals has recognized these situations in the few cases that have been brought before it, and has corrected the deflection toward liberality; and the work of that court has been easier because only a transcript is ever before that court and sobbing wives do not appear before that court.

With the changed social and economic position of woman, the right to alimony or support "should not be used as an instrument to punish a husband who is 'guilty' in the matrimonial relation, but rather should relate itself definitely to the wife's need," as Professor Kelso, a student of the subject, has said; and he has said, further: "The difficulty which alimony seeks to solve is an economic question of reallocating the property out of which support should come during the married state to the circumstances of temporary litigation or permanent dissolution of the old relationship. To consider it a reward of merit for the virtuous, or as a punishment for the wrongdoer, is to misconstrue the premises." *6 Law and Contemporary Problems (1939, No. 2) 195.*

3. When the ecclesiastical courts first devised the equitable remedy of alimony the husband was called upon to support the wife, but only when she had no means of support and only in such case of need. If the wife had a separate income, the joint income of the spouses was made the basis for computing the amount of permanent alimony. Bishop's Marriage, Divorce and Separation was published in 1891; and this textbook shows (sections 1012, 1013, 1016) what the practice in alimony and support had been for many years: "The wife's income is, as explained in other connections, always an element in the alimony computation. The method is to add it to her husband's, consider what under all the circumstances should be allowed to her out of the aggregate, then from the sum so determined deduct her separate income

and the remainder will be the allowance to be given her.
* * * Any other means possessed by the wife will be car-
ried into the account, as, that in leaving her husband she
took with her what is adequate. * * * The wife's earn-
ings and capacity to acquire must be taken into the account.
* * * If the parties have been accustomed to toil for sup-
port and accumulations, the wife should not have an allow-
ance so large as to relieve her from all necessity of exertion."

Our court of errors and appeals has held that one of the
elements in estimating alimony is "the separate property and
income of the wife," and in its decision it added that "any
other factors bearing upon the question" are to be considered.

Our statute broadly recognizes that alimony in a divorce
suit and support in a maintenance suit are contemporary
problems. The making of an order for alimony or support
involves not only legal considerations but social ones as well.
While the order or decree is one for the payment of money,
it should have a social quality and value, and the statute
comprehends the making of such an order and such a decree.
When a wife is gainfully employed, as complainant is, and is
apparently in good health, and is to continue in her employ-
ment, with apparently a pension in prospect, and these things
may be said of the complainant, she should be held to a con-
tinuance of her employment, in any estimation of alimony
or support. Society is interested in her thus continuing, and
the public of the community in which she lives is immediately
so interested. It may be that her continuance benefits her
husband in a money way, but this continuance also benefits
the wife in more ways than one. And it benefits society, "the
state," and the public of her community. A judge who reads
more than law reports knows this, and some profitable pages
might be written here about this important feature, should I
permit myself the space. This feature and some of the other
features that I am mentioning in these conclusions have not
been written about in our law reports, but there is an inter-
esting contemporary literature on these features and other
dependent or related features. Self-support, whether of men
or women, is to be encouraged; and anything that makes
for self-support, and is against dependence on the public,

presently or prospectively, is not only to be encouraged, but is to have affirmative force in estimating and coming to a judgment on alimony or support. While the most important factors in estimating alimony are monetary—for, of course, without such factors there could be no order or decree for payment—there are many other factors or elements which are non-monetary, some of which, however, as a little consideration will show, may have monetary significance later. Some factors are intangible; and some are too often lost sight of, including the interest or right of the state in divorce and maintenance litigation—"The state, which never formally appears as a party litigant, and is too often forgotten by the custodians of the law."

4. There is a persistent attraction for the bar to the notion that permanent alimony in a divorce suit, and also support in a maintenance suit, should be settled at "one-third of the husband's income," to the entire obliteration and undiscriminating exclusion of the many other factors that should be considered and which have more or less importance depending on the circumstances of particular cases. Always, "the circumstances of the particular cases" are the bases, so to speak, of an alimony or a support estimation. I think that, usually, there should be no difference between an estimation in a divorce suit and one in a maintenance suit, despite an old decision in this court which was approved by our court of errors and appeals, which decision, if completely followed, would always probably result in a less amount being allowed in a maintenance suit than in a divorce suit. That decision might have influence in exceptional maintenance cases, that is, cases where it appears likely that the parties may live together again if the court does not make the amount allowed for support "attractive" to the wife. And in a divorce suit, the concrete effect of the decree on property is to be considered. I remember this old decision was mentioned by counsel for the wife in this case. But it is to be said, first, that this old decision should not be applied abstractly, and if applied at all it should be applied only to an exceptional case, one where a likelihood of the parties again living together might be viewed as a reason why the amount should be settled on the basis of "a tem-

porary separation," and so should be less. Next, I did not apply this old decision in this case because I think that these parties are permanently separated. And I should add that I regret to say that my experience is that such exceptional cases are proportionally so few as to be negligible. Of course this one-third notion has never been more than a guide. It is not a rule, even in a loose sense. And, so far as amounts of alimony and support to be provided by this court are concerned, there are no "precedents." Our court of errors and appeals has decided that the only "standard" of alimony in a divorce suit is what "the circumstances of the parties and the nature of the case shall render fit, reasonable and just." And in a maintenance suit the only "standard" is such an amount of support "as the nature of the case and the circumstances of the parties render suitable and proper in the opinion of the court." This court is not bound except by the words and the intent of the statute and the decisions and opinions of our court of errors and appeals. Advisory Master Campbell spoke of this persistent attraction of the bar to this one-third notion as an overruling guide, in *Williams* v. *Williams* (*1934*), *12 N. J. Mis. R. 641* (at *p. 645*). In one case one-third of the husband's income may be too little; in another case it may be too much.

It must be said that the courts, in the past, without full consideration, have attached undue importance to this one-third guide, as the judges of this court well know. Paul L. Sayre, a student of the subject, editor of the Iowa Law Review, who told us, what we all surely know, and what of course should be expected, namely, that "the basis for estimating alimony has significantly changed in the past few decades," has spoken of this one-third notion in his paper "Divorce by Judicial Process," *18 Iowa Law Review* (*1933*), *501:* "Now the courts, with *carte blanche* as to the awarding of alimony, seem to take the rough approximation of one-third of the husband's income as an aggregate sum. On what basis this proportion was determined, nobody knows. Apparently, it was based in part upon the general rule of inheritance that the wife will receive one-third of her husband's property on his death. The common law rule in the case of absolute divorce was for the wife to receive maintenance only,

and while the ecclesiastical courts gave her one-third or one-half, as we have noted, this was done on the basis of the continuation of the marriage and the continued enjoyment of the husband of his wife's property."

5. "Judicial discretion is probably nowhere more intimately connected with human relations, nor is it given freer reign, than in the field of domestic relations. Particularly is this true when applied to the question of alimony. The nature of judicial discretion, however, is such that the limits of its exercise cannot be fixed by definition." "The Exercise of Judicial Discretion in the Award of Alimony," by E. W. Cooey, a student of the subject, in *6 Law and Contemporary Problems (1939, No. 2), 213.*

While the limits of judicial discretion may be hard to define, judicial discretion itself is really easy to understand. We may get at its meaning negatively. Taking expressions from recent opinions of other-state courts we find it is not "manifestly unreasonable action;" not "a ruling which effects injustice;" not "action clearly against reason and evidence;" not the "whim or caprice of a judge, not his arbitrary will." All of these are abuses of judicial discretion. And, in our own state our court of errors and appeals has decided that "difference of judicial opinion is not synonymous with abuse of judicial discretion." Negatively at least we know what judicial discretion is.

In exercising the discretion granted and indeed imposed by the statute in matters of alimony and support, the use of common sense is implied; surely it is not forbidden. There are no "precedents" of old or present courts that need to be followed. There are many things called, usually, "guides," but even these are not strait-jackets. On no other head is flexibility so desirable as in alimony and support proceedings; and our statute recognizes this. In virtually all the American jurisdictions the amount of alimony and of support is left to judicial discretion. And the statutes are purposely vague so that full unrestricted discretion may be given. Our court of errors and appeals has decided that "there is no prescribed standard for the admeasurement of alimony;" and only this year that court decided that "The enforcement of the husband's obligation is committed to the sound discretion of the

court of chancery, guided by the statutory standard, that is, what in the special circumstances, is 'fit,' 'reasonable,' and 'just.' " Always, of course, "the special circumstances" are the bases for alimony estimation. One who reads on the subject finds that rather than there being any trend toward defining judicial discretion, there is a trend toward an undefined discretion without any restriction whatever, so that the courts may be enabled to act according to justice, with propriety. Of course the courts must act without willfulness or favor.

6. Advisory Master Herr gives a list of the factors or elements which have been considered by our courts in estimating alimony and in coming to a judgment thereon. *1 Herr, Marriage, Divorce & Separation 481-484.* This list is the most complete list down to date to be found in any law book, but Advisory Master Herr gives the list, he says, and properly, "without suggesting that other elements may not be taken into account in certain cases." Always, it is "the facts of certain cases" that are to be considered, for, and this is always to be kept in mind, simple and obvious as it is, "no two cases are exactly alike." I suggest that every day, in cases that are not being reported, the courts are considering elements not mentioned in Advisory Master Herr's list, long and down to date as his list is, for his list, as he says, shows only the elements in our reported cases. And then, when a judge of this court is considering elements, he knows that, if he is to act sensibly, in "a case of certain circumstances" that he should make a selection of elements, and, it may be, that he should give emphasis to one or more of the elements. There is not, necessarily, any precedence or equality of the elements in an alimony or support estimation. Undoubtedly, other elements than the ones usually named are constantly making their appearance, and other elements will appear in the future, and in the near future. The changed social and economic conditions of woman, coming not only from the Married Women's acts and the "equal rights" laws, but also otherwise caused, and things not in the laws and not belonging there, have already strongly influenced the administration of alimony law. England has new divorce laws, which came into force last year, and the trend in England is toward

equality between man and woman. It is understood there that "the interpretations of the Divorce acts are to be alike for men and women." There, if a woman divorces her husband for his insanity she is to pay for his support if she has means and he needs support. In the old days, as the legislative divorce grew in popularity, it became common practice for Parliament to insist upon a pecuniary provision for the support of the guilty wife, as a condition to granting a divorce to the husband. The English Judicature act of 1925 permits an order for alimony, "compassionate alimony," to a "guilty" wife. In this country, there are organized endeavors to have laws enacted which shall provide that no woman under thirty-five years of age who has no child shall receive alimony unless it is shown that she is physically unfit to pursue any gainful occupation and that she has no income from other sources sufficient to maintain herself. In this state, usually, alimony is denied where the marriage has been of short duration, and the wife is of normal health, is self-supporting and there is no child. But, usually, where a wife is not self-supporting, her potential earning power is not counted upon. However, no matter what the near future may lay before us, it is to be said that under our statute with its purposely vague terms and its grant of full judicial discretion, all phases may be properly dealt with as they arise for consideration. But if husbands are to have orders or decrees for support from their wives, we will need statutory authority. Vernier & Hurlbut, so well known for their studies of American Family Laws, in their article of this year state as follows: "In 1886 two states had statutes allowing alimony to the husband, and there were three others which did not distinguish between the spouses in this regard. To-day the statutes in fifteen jurisdictions authorize the granting of alimony to the husband, and this does not include limited divorce statutes or statutes allowing the court to award part of the wife's property to the husband unless the statutes expressly denominate such an award as alimony." I am mentioning some of these things only illustratively; and I mention none of these things as showing any difficulty in the present administration of our maintenance statute in connection with cases having the subject-matter of this appeal.