103 A.2d 234 (1954)
DU PONT
v.
DU PONT.
No. 23, 1953.
Supreme Court of Delaware.
March 1, 1954.
*235 James R. Morford and William Marvel (of Morford, Bennethum, and Marvel), Wilmington, for appellant.
Arthur G. Logan and Douglas W. Troll (of Logan, Marvel & Boggs), Wilmington, for appellee.
WOLCOTT and TUNNELL, Justices, and TERRY, Judge, sitting.
TUNNELL, Justice (for the majority).
This case is up from the Court of Chancery on appeal from a judgment granting separate maintenance to a wife.[1] There is no appeal from the Chancellor's findings that the wife (here plaintiff) was abandoned without just cause and that she is in financial distress; the appeal is from the amount of the award  $300 a month , which the wife contends was arrived at by misapplication of the law, and which in any case, she says, is in the circumstances so manifestly inadequate as to constitute a clear abuse of judicial discretion.
The Chancellor's opinion, with a frankness designed to protect the rights of any who would challenge it, explains his reasoning in detail. 93 A.2d 500, 505. It concludes thus:
"I now consider the amount of the award to plaintiff. Plaintiff seeks $1,500 per month. She was granted interim relief of $600 per month. I can say that in the absence of the `diminishing' factors mentioned above, I would here have awarded plaintiff a substantially larger sum because defendant has substantial means. However, for the reasons stated, I do not feel that she is entitled to the benefit of the ordinary rule and should in fact be penalized. I conclude that $300 per month commencing February 1, 1953 and until further order of the court will be reasonable."
Since the award was admittedly below the figure to which plaintiff would have been entitled under the "ordinary rule", she, therefore, focuses attention upon the nature of certain of the Chancellor's deductions and challenges his right to make them.
The first penalty was on account of "perjury in these proceedings". The explanatory background of the quoted expression is the Chancellor's finding that prior to her marriage plaintiff's means of support had been men. Exercising her charms for the entertainment of men, she had thereby maintained herself for several years on the champagne circuit of New York's cafe society. But the unsavory details can be spared. The point is that the Chancellor found such to have been her means of livelihood, and he also found that when specific questions were first put to her about it, in spite of her oath, she had denied the facts and, in order to supply a respectable explanation of her finances, had invented certain sources of income. This is what the Chancellor referred to as perjury.
*236 The amount of the order was further reduced for certain other reasons which the opinion states thus:
"I further conclude that among other things, the plaintiff's concealed activities prior to the marriage, especially when combined with her post-marital actions, should also go to diminish the award. See 42 C.J.S., Husband and Wife, § 624."
We have no way of knowing what the Chancellor referred to by the phrase "among other things", nor is it clear to us exactly what he meant by "post-marital actions". The marital difficulties between these parties are for the most part the subject of conflicting accounts, and, unlike the case of the events preceding the marriage, we here have no way of knowing what testimony the Chancellor took to be true. Therefore, we know neither the nature of these items nor the extent of their influence upon the award.
It appears from the opinion that by "concealed activities prior to the marriage" the Chancellor referred to the immoral life plaintiff had led for some years before her marriage, as above explained, and to plaintiff's pretending to her suitor to be a better woman than she was. It was found that plaintiff had in fact mentioned to defendant the improper sexual relationships she had carried on with two other men (not counting defendant), either during or after her first marriage, but she had apparently not disclosed to the defendant any more than two of these immoral relationships or the fact that they had been her means of support. As to defendant, he especially resented not being apprised of the fact that he was not the only man with whom plaintiff had been engaged in an exchange of favors. As to the Chancellor, it is not clear to us whether what particularly concerned him was the degree by which plaintiff's promiscuity had exceeded what she had previously described to her fiancé, or whether it was the meretricious nature of that promiscuity, or both.
Such is the record of the Chancellor's findings.
A strenuous effort was made by counsel for plaintiff to establish that the Chancellor's conclusions of fact were unsupported in the record, but they appear to us to have been fully justified. This plaintiff's past almost from girlhood has been gone through with a fine-toothed comb. It is astonishing, even with the expenditure of great sums of money, that so much apparently credible testimony could have been brought to light, in some cases so many years after the events. We accept as facts all such as the Chancellor specifically found.
Clearly the Chancellor was impressed by plaintiff's past, and he felt that both the moral degradation itself and her lying about it under oath put him under a duty to treat her differently from the way he would treat others in similar circumstances. So he deducted from her maintenance award  thereby correspondingly rewarding the defendant  some unspecified sum each month, to be repeated indefinitely.
Now we must consider plaintiff's contention that in imposing these penalities he exceeded his authority. In deference to chronology, we shall first consider the deduction for activities prior to the marriage.
If plaintiff, by the misrepresentation of her character or occupation, had fraudulently induced defendant to marry her, that, of course, would be vastly different from the present case. It would draw into question the very marriage bond from which the duty of maintenance is derived. Indeed, the defendant here tried, though vainly, to establish such fraud. It developed, however, that he had known so much about plaintiff, and also had himself been involved with her in such a way, that the Chancellor was convinced that a man of ordinary prudence in the same circumstances  if logic will admit such a postulate  would not have been beguiled. The marriage bond joining these parties, therefore, remains unimpaired, and we are left with the residual question as to whether a concealment of facts which, because it *237 ought not to have deceived, is ineffective to destroy the marriage, is, nevertheless, effective to diminish the rights of the wife.
It must at once be noted in this connection that no imputations have been leveled against plaintiff's chastity after marriage to defendant. There is contradicted testimony tending to prove that she was quarrelsome, particularly about money matters, and that she had "tantrums" and "made life pretty difficult" for defendant, so that he "couldn't take it any more", but the Chancellor either found the defendant's proof in itself insufficient, or he resolved the conflict against defendant, for he failed to find plaintiff in any way responsible for the separation. He held, in fact, that she had been deserted without "legal excuse". In any case, the complaints now made about plaintiff have nothing to do with matters of sexual morality and cannot be held out as a continuation or recurrence of the old weakness. So far as the record shows, therefore, she made a complete break with the past when she took her marriage vows. Consequently, the question as to what bearing her pre-marital history has upon her rights as a wife is fixed in clear focus.
It is our view that if her concealment of these earlier activities does not amount to a fraud which will vitiate the marriage, then, so far as it concerns support, it amounts to nothing. Curtailing the full extent of this woman's rights, in the light of her particular record, may satisfy the demands of a righteous indignation, but in so far as it would establish the precedent of offering husbands a cash premium for raking over the dead coals of the remote, pre-marital past, it would institute a rule which in general application would prove intolerable.
This whole subject is so constantly before the courts and is so vexatious in its nature that it is possible to find some authority somewhere for almost any kind of a view. Therefore, we have seen some cases in which courts, in fixing awards for support, appeared to take into consideration certain indiscretions or acts of immorality antedating the marriage. This has usually, if not always, been done as a matter of assumed and unquestioned right. Yet, even where the conduct was after the marriage, and hence under the a fortiori rule, there has been a marked growing tendency on the part of the courts to regard separate maintenance orders as being primarily matters of economics and to assert the principle that the judiciary has no prerogative to impose sanctions for sin.
Accordingly, our own Superior Court, in Brown v. Brown, 3 Terry 157, 168, 29 A. 2d 149, 153, speaking through Judge Rodney on the subject of statutory maintenance pendente lite, thus touched upon the underlying philosophy:
"Innocence and need would seem to be the only valid requisites for maintenance pendente lite, and, indeed, in the more modern view, innocence itself is not necessarily a requisite. It has come to be realized that while the marital contract remains undisturbed, the primary duty of support rests upon the husband, and not upon the public, and that a guilty wife may be just as hungry or as much in need, and equally liable to become a public charge as one who is without fault. Divorce is no longer an Ecclesiastical judgment for a spiritual offense or sin, but a necessity for the correction of social maladjustment."
The court there ultimately confined its consideration of the amount of temporary support to the "need of the wife and the ability of the husband".
The most thorough treatment of the principles pertinent to this subject which has come to our notice appears in an opinion of Advisory Master Van Winkle, in O'Neill v. O'Neill, 18 N.J.Misc. 82, 11 A. 2d 128, 130, which was later affirmed by the Court of Errors and Appeals of New Jersey, 127 N.J.Eq. 278, 12 A.2d 839. There, the findings in respect to the husband were these:

*238 "This husband has been an undesirable husband over a long period, so far as money support for his wife was concerned, and he has been an undesirable debtor for third parties. He has been a difficult litigant; he has evaded service of papers; he made promises to the court that were not kept."
Yet, after thorough consideration and discussion, the court concluded that the misbehavior of the husband was extraneous to the issue of support, its opinion being expressed in part in these words:
"If we go into these questions, if we seek to punish a `guilty' husband on an application for alimony, by giving more because he is `guilty', we need to deal with moral questions, when our endeavor should be only to provide for the wife's needs to the extent of the husband's ability."
See also Law and Contemporary Problems (1939), Vol. 6, 186 (195).
And there is sound reasoning underlying these authorities. Where parties are man and wife, it is obvious that they are normally expected to live together. That does not mean that she is to sleep in the garage, eat with the cook, and wear cast-offs. It commonly contemplates not only sharing the same residence, but eating at the same table, enjoying the ministrations of the same servants  if they have servants , and wearing such apparel as befits the husband's station.
The reason these particular parties are not living together is because, as the Chancellor found, defendant left plaintiff without legal excuse. That finding looms large in influence upon this case. We do not see how a husband, by doing wrong, can put himself in a better position in the eyes of the law than he would occupy if he had done the right thing. If he is unable to dissolve the marriage, and if his wife has done nothing to justify him in leaving her, then the duty of support is automatically established and defined.
It must not be thought from the foregoing remarks that we should hold it error, for instance, in a case where the husband has servants, to fail to make such provision for maintenance of the wife that she also can afford servants. Any such absurd general holding on our part would constantly fly in the face of the fundamentals of economics, and would always constitute a trespass upon that wide field of discretionary latitude which is reserved to the trial court. All we mean here to assert is the basic principle that support to the wife, so long as she remains the wife, must be as the wife, not as some creature of inferior standing. Ours is not one of those civilizations which recognize degrees of wifehood.
Now as to the false testimony.
The Chancellor used the word "perjury" in this connection, and counsel have devoted much attention to the issue as to whether what was done constituted or did not constitute the crime by that name. However, we see no importance in the label. The point is that the Chancellor found certain sworn answers of the plaintiff to be false and considered this falsity as requiring him, in the exercise of a sound discretion, to punish her in respect to the amount of her maintenance order.
It is argued that the Chancellor in administering this punishment could have been applying the equitable doctrine of "clean hands". But application of that doctrine would have barred plaintiff from any recovery whatever, and, in any case, the authorities appear to be in accord that it is inapplicable in this connection. Pomeroy's Equity Jurisprudence (5th Ed.) Vol. II. p. 134; Lyman v. Lyman, 90 Conn. 399, 97 A. 312, 314, L.R.A.1916E. 643.
Defendant has made a more strenuous effort to justify the penalty imposed for falsehood as an exercise of the inherent power of the Court of Chancery to punish for contempts of court. This contention requires more consideration. We pass over the point that there is not a single thing *239 in either the record or the opinion to suggest that any contempt proceedings were held, or that contempt, as such, was ever in the judge's mind. Also we waive consideration of the question as to whether the contempt, if contempt it was, is actually allocable to the Chancery action, since most or all of the offending testimony was actually given in the annulment proceeding in the Superior Court and only brought into this action by stipulation. Further, we brush aside the question as to whether a court can properly punish for contempt where the testimony said to be false is disputed and the court can neither judicially notice nor incontrovertibly demonstrate its falsity. 12 Am.Jur., "Contempt", Sec. 17, p. 401, and 17 C. J. S., Contempt, § 24. Likewise we leave untouched the very troublesome question as to how the court would have the power to reward one of the parties, as the defendant is here rewarded, for an offense against the Court. 17 C. J. S., Contempt, § 94.
In order that we may cover not only the question of contempt of court, but also at the same time any other theory upon which the Chancellor's action could possibly have been based, we move on to the larger question as to whether, after all, the fact of this "perjury" is relevant.
While lying under oath is a matter of the very gravest importance in its own right, and is always punishable in proper proceedings, it appears to us to be extraneous to the issue as to how much money this husband should provide for the support of his wife. Criminal contempt, for instance, is required to be a wholly separate and independent proceeding. Passaic-Athenia Bus Co. v. Consolidated Bus Co., 100 N.J.Eq. 188, 135 A. 282; 17 C. J. S., Contempt, § 62b.
And there is sound reason for this requirement of separation. Suppose a plaintiff in a damage suit testifies that a certain accident caused him to lose ten weeks of work when actually he lost only five. Is he to be awarded judgment, on account of the perjury, for only two or three weeks? Certainly not. He is entitled to get his judgment on the basis of the truth, and he then runs the personal risk of punishment for perjury or contempt. The facts that we here are doing equity and are dealing with an exercise of discretion, instead of passing upon a liquidated demand at law, still leave the fundamental judicial responsibility unaltered.
Perhaps the Chancellor concluded that he had the power to "deny or restrict relief" on account of this false testimony because it is an ancient rule that, until one purges himself of a contempt, he may be prevented from going forward with his case. But this does not mean that a contemner can ultimately be deprived of his substantial rights in the suit in connection with which the contempt was committed, as the court did here. See 17 C. J. S., Contempt, § 97; Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215; and citations collected in 13 C. J., p. 92, n. 28.
A determination that a party has been untruthful, of course, affects the credibility of his whole testimony, and lying on one issue inevitably impairs one's chances of prevailing on any other disputed point. But here the facts were resolved, and the Chancellor had arrived at what he conceived to be the truth. We do not understand that he could then reach back and amend his factual conclusion because of the untruths which originally obscured his way. We think that the two issues of support and of misconduct at the trial are separate and that they may not be intermingled.
Having concluded that some of the deductions the Chancellor made were improper, we must now decide what is to be done with the case.
It is argued that we are bound to affirm unless we find that $300 a month is so unreasonable as to amount to an abuse of discretion. We do not reach a consideration of the reasonableness of this award, for it at once appears to us that to call the suggested type of ruling an "affirmance" would be a misnomer. The Chancellor stated in plain language that $300 would not in his *240 judgment be a proper allowance except after the deduction of certain penalties, including some which we have now determined should not have been deducted. To amend his rule while ratifying the result to which it led would actually amount to disagreeing with him on both law and fact.
Our present problem might be simplified if the Chancellor had given us the figure he found to be indicated by the "ordinary rule" and the several amounts he deducted therefrom, but he, of course, did not supply those figures, for in his view they could have no materiality. Moreover, we realize that it is utterly unrealistic to suggest that the Chancellor reached his conclusion as if he had been doing elementary sums.
Lacking this information, we are urged simply to direct entry of judgment in such amount as our own discretion dictates. The argument for thus taking matters into our own hands is built upon the familiar doctrine which obtains in this state, that a court of appeals in equity is the judge of both law and fact, in that respect contrasting with appeals from the law side, where the reviewing court must confine its holdings strictly to rulings on the law. We are in this connection cited to the opinion in Sohland v. Baker, 15 Del.Ch. 431, 444, 141 A. 277, 283, 58 A.L.R. 693, where this court some years ago quoted with approval certain language taken from Nashville Railway & Light Co. v. Bunn, 6 Cir., 168 F. 862, including, in particular, this passage:
"`The writ of error is a common-law writ, and searches the record for errors of law in the final judgment of a common-law court. If error is found, the judgment awards a venire facias de novo. Parsons v. Bedford, 3 Pet. 446, 448, 7 L.Ed. 732. The appeal is a procedure which comes to us from the civil law along with the fundamentals which go to make up the jurisprudence of a court of equity. Its office is to remove the entire cause, and it subjects the transcript to a scrutiny of fact and law, and is, in substance, a new trial.'"
It is argued that it would be in harmony with Sohland v. Baker for us to regard this case as being before us for a completely new trial  though on the old record , and, accordingly, that we should now order our own choice of an award entered as a judgment in the Court of Chancery.
There is a temptation to launch into a long dissertation, testing whether this "new trial" rule is not to be construed much more narrowly than the expression itself suggests. See the text (not the syllabus) of an opinion of the Supreme Court of Rhode Island in Vaill v. McPhail, 34 R.I. 361, 83 A. 1075. Yet, this broad subject, while attractive, is delicate in the extreme, and we are pleased that it is unnecessary for us here to undertake any general treatment of it.
In a "yes or no" case, calling for dismissal of a bill upon which the trial court erroneously gave judgment, or injunction where injunctive relief was refused, or the like, we might well order the appropriate judgment entered. Compare Carlisle v. Delaware Trust Company, Del., 99 A.2d 764, or Maurer v. International Re-Insurance Corp., Del., 95 A.2d 827. But the judgment here sought is one to be measured by the exercise of judicial discretion, and for us in this instance to assume the prerogatives of the trial judge would be to depart from the practice contemplated by our constitution and at the same time to overlook the axiomatic desirability of having fact questions decided by the court which sees and hears the witnesses.[2]
In discretionary matters, even though the judge's decision should turn out to be distinctly different from what ours would have been had we sat in his place, still we have no right to tamper at will with his judgment. Stabler v. Ramsay, Del., 88 A. 2d 546, 552. Our normal constitutional role in respect to the amount of a maintenance order, therefore, is simply to determine *241 whether it was arrived at by the application of right principles of law, and, if so, to see whether the amount is or is not reasonable. If the diversity of views as to the amount does not stem from error in law or rise to the level of a clear abuse of discretion, it is our duty to leave the award alone.
We do not understand that the trial judge is functus officio in a particular case merely because he once admitted certain evidence which should have been excluded, or because, as here, he fell into legal error in the computation of his judgment. This is unlike a case in which the judge has committed an abuse of discretion on the point which needs determination and has already demonstrated that his judgment in the matter is not to be trusted. Under those circumstances there is no purpose in sending a case back for the exercise of what the appellate court regards as a "sound" discretion.
The principle of preference for the several courts to perform the respective functions originally entrusted to them has the support of eminent authority. In Marconi Wireless Telegraph Co. v. Simon, 246 U.S. 46, 38 S.Ct. 275, 277, 62 L.Ed. 568, for instance, the lower federal courts had dismissed a patent infringement suit under the mistaken theory that the defendant was exempt from liability. When the Supreme Court ascertained that error, the question then was whether that court would remand or go on to decide the controversy on the merits. In announcing the decision to remand, Mr. Chief Justice White's opinion says this:
"(2) It follows therefore that to finally decide the case would require us to determine whether or not the apparatus as furnished was a direct infringement or mere contribution. But to do this would call for the exercise on our part of a duty which it was the province of the court below to perform and which doubtless it would have performed but for the error into which it fell concerning the interpretation of the act of 1910 and the application to the subject which was before it of the prior decision of this court in Crozier v. Krupp, supra [224 U.S. 290, 32 Sup. Ct. 488, 56 L.Ed. 771]. Under these circumstances, as we have clearly removed by our decision in the Cramp Case all reasons for misconception concerning the statute and have thus cleared the way for the discharge by the court below of its duty, we think the case before us comes directly within the spirit of the ruling in Lutcher & Moore Lumber Co. v. Knight, 217 U.S. 257, 30 Sup.Ct. 505, 54 L.Ed. 757, * * *."
This is precisely the sort of thing we did in Great American Indemnity Co. v. State to Use of Mills, Del., 88 A.2d 426. Also compare Pierce v. Wahl, Del., 86 A.2d 757.
And something other than a blind devotion to orderly procedure supports this view. Substantial rights are involved. As we have already mentioned, the trial judge hears and observes the witnesses. He breathes the atmosphere of the case, and thus, as a usual thing, he can render a better judgment on the facts. Moreover, the fact that the instant judicial function is in the field of discretion, by very definition, embraces the likelihood that reasonable men may differ in respect to it. The familiar rule that an appellate court should sustain a right decision even if the lower court gave a wrong reason for it could never apply to such a case as this, for no one can surely say that $300 is "right", while $275 or $325 is "wrong". In this field we do not deal with absolute right and wrong; the most that one can say is that a suggested figure seems to be, or seems not to be, "about" right.
Two courts, acting independently, would almost certainly enter judgments in this case for somewhat different sums of money. It would be a coincidence if they did not. If the Chancellor's view of a fair figure under the correct principles of law is larger than ours would be, and yet not so large that we could or should overturn it, the plaintiff is entitled to that advantage. Likewise as to the defendant in the opposite case.
*242 In our view, therefore, the proper course is to reverse the judgment and remand the case to the Court of Chancery for entry of an award which the Chancellor in his discretion will fix in accordance with the legal principles set out in this opinion. The mandate will so require.
WOLCOTT, Justice (dissenting).
I do not agree with the majority of the Court in this appeal. The majority has concluded that the Chancellor reduced the amount of the maintenance award solely by reason of the so-called "perjury" of the wife, and a sense of righteous indignation at her past immoralities. I agree that a reduction because of the "perjury" was error, but I think the other factors taken into account by the Chancellor were matters consistently taken into account by courts in such applications. His citation of 42 C.J.S., Husband and Wife, § 624, amply demonstrates the working of his mind. It is significant that the cited text does not remotely suggest that a reduction may be made for past immoralities. I think these other factors are ample to warrant an affirmance of his judgment.
However, irrespective of this point of disagreement, another and more compelling reason exists why the judgment should be affirmed. This Court sitting in an appeal from Chancery has the authority and power to review the evidence and make its own findings of fact if necessary, even though they may be in addition to or contrary to those made by the Chancellor. Thus, in this appeal, we may independently do that which the Chancellor failed to do and determine for ourselves what the amount of the award for separate maintenance should be. The majority, however, says that to do this, in this type of appeal at least, would unwarrantedly extend the scope of appellate review. Let us examine the question.
Commencing with Article 17 of the Constitution of 1776, the highest appellate court of this state in equity appeals has always had all the authority and powers of the House of Lords of Great Britain sitting as the court of last resort in appeals from Chancery. Our successive constitutions have preserved this authority, and have also carefully preserved the distinction between appeals from Chancery and Writs of Error directed to the law courts.[1]
An appeal from Chancery to the House of Lords was in effect a re-trial of the issues of fact and law tried below. Subject to the limitations that no new evidence could be received, and that counsel would not be heard on a point not raised in the petition of appeal, the House of Lords after considering the evidence was free to affirm, remit, reverse, modify, or direct the entry of a new decree as the circumstances of the case required. 2 Daniell's Chancery Pleading and Practice, (4th Ed.), 1502, 1504; Adam's Doctrines of Equity, 399; Goldsmith's Equity, 191; 2 Newland's Practice, 219; Eden v. Lord Bute, 1 B.P.C. 465; Barbon v. Searle, 1 Vern. 416; Attorney General v. Scott, 1 Ves. 419.
This Court's predecessor in Sohland v. Baker, 15 Del.Ch. 431, 141 A. 277, 58 A.L.R. 693, re-affirmed the principle that the appellate powers of the Supreme Court of Delaware sitting in Chancery appeals are coextensive with those of the House of Lords. Nor have our predecessors in the former Supreme Court sitting in review of equity causes hesitated to examine the evidence and to form their own estimate of what the facts of the cause were, disregarding for that purpose the findings of the Chancellor. See Peyton v. William C. Peyton Corporation, 23 Del.Ch. 321, 7 A.2d 737, 123 A.L.R. 1482, and New York Trust Co. v. Riley, 24 Del.Ch. 354, 16 A.2d 772, in which case the court made an independent finding of domicile contrary to the finding of the Chancellor, even though there was substantial evidence in the record to support the Chancellor's finding. In John Roane, Inc. v. Tweed, Del., 89 A.2d 548, the present Supreme Court, in reversing a judgment of the Chancellor dismissing a complaint for the enforcement of a *243 restrictive covenant in an employment contract, examined the evidence and directed the entry of a judgment of partial enforcement as to geographic extent and time, in the absence of any finding on the point by the Chancellor. And as recently as February 5, 1954, in Equitable Trust Co. v. Gallagher, Del., 102 A.2d 538, we made our own factual findings, reversing the Vice-Chancellor, who had held that there was no evidence on which to make any findings of fact.
It is thus apparent that this Court on appeal has the power and authority, and has frequently exercised it, to examine the facts and the law of a case and to reach its own conclusions with respect thereto. The cause is before us on law and fact, and if the findings of fact of the Chancellor are erroneous, deficient or absent, we are free to examine the evidence, to reach our own conclusions, and to order the Chancellor to enter a judgment embodying them. The only limitations upon our authority in this respect are those which our sense of judicial propriety and discretion and the exigencies of the cause may dictate. We are under no compulsion to act, but we may act if we think it proper.
I do not understand the majority to agree or disagree with the foregoing statement of the nature and extent of appellate review of equity causes. The majority finds it unnecessary to rule upon it in this appeal, because it is said that the fixing of the amount of an award for separate maintenance involves the exercise by the Chancellor of his discretion, and that therefore it is required in all instances that his discretion be exercised in a proper manner before the appellate court may interpose its judgment. This, says the majority, distinguishes the present appeal from the ordinary "yes or no" type of appeal. To my mind this is to make a distinction without a difference, since the discretionary acts of the Chancellor are reviewable by this Court.
Such authority as there is in other states upon the precise question supports the proposition that an appellate court in an appeal from an equity judgment awarding separate maintenance may examine the evidence, reach its own conclusions as to the facts, fix the amount the wife is entitled to for separate maintenance, and enter a mandate directing the trial court to enter a judgment in that amount. Cf. Harley v. Harley, 255 Ky. 370, 74 S.W.2d 195; Collins v. Collins, 182 Okl. 246, 77 P.2d 74; Closz v. Closz, 184 Iowa 739, 169 N.W. 183; Nichols v. Nichols, 189 Ky. 500, 225 S.W. 147; Jones v. Jones, 95 Ala. 443, 11 So. 11, 18 L.R.A. 95.
Nor is there anything so sacrosanct about the exercise of judicial discretion by a trial judge as to leave an appellate court helpless to do other than remit the cause for further proceedings with the gentle admonition to do better next time. For example, in Mahnke v. Neale, 23 W.Va. 57, a decree entered on the verdict of a jury, after the Chancellor in his discretion had framed an issue to be tried before a jury, was reversed on the ground that the evidence was not so conflicting as to warrant the framing of an issue. However, the cause was not then sent back to the Chancellor for further proceedings. The Supreme Court of West Virginia examined the evidence, found the facts, and sent the cause back for the entry of a decree formulated by it. The court said:
"If the court below could have properly determined the cause, it [the Supreme Court] will reverse the decree directing such issue, and set aside all subsequent proceedings thereon and enter such decree as the circuit court ought to have entered notwithstanding said verdict."
In my opinion, therefore, in this appeal we have the authority (assuming the Chancellor was completely at sea in determining the amount of the award, a point I do not concede) to examine the record before us to determine the facts which may properly be considered in fixing the amount of the award, to fix the amount and to direct the Chancellor to give effect to it. We may do this, in my opinion, without first going through the time-consuming gesture of a referral back for further proceedings below. *244 We have the authority. The question is should it be exercised? I think it should be.
Courts are established to decide controversies between men and to bring them to an end. Not the least desirable function of courts is the ending of litigation. To refuse at this juncture to decide finally the controversy before us is to lose sight of this cardinal principle.
This controversy arose from the marital difficulties of the litigants. The first step was a complaint filed by the wife in the Court of Chancery in 1950 for separate maintenance. This is the cause of action before us now. The second step was a petition of annulment filed by the husband in the Superior Court. Both of these actions in various phases have been before this Court. In the course of all this litigation, this Court has filed six opinions[2], the Court of Chancery has filed five opinions[3], and the Superior Court has filed two opinions[4]. The amount of briefing and argument has been staggering. There has already been more judicial utterance and deliberation upon this marital controversy than is ordinarily devoted to causes of the greatest public importance. In my opinion, if a court can speed an end to the steady flow of litigation arising from this one set of circumstances, it will do a service to the litigants and to the administration of justice.
The majority of this Court will send this cause back to the Chancellor with instructions to reconsider the amount of the award to be made the wife. In so doing, however, no guide is given the Chancellor except the direction that he may not take into account the "perjury" of the wife, nor her concealment of her moral character prior to marriage. The Chancellor will start afresh. If past history is any guide to future conduct, one or both of the parties are very likely to be dissatisfied with his new award and will be again in this Court seeking review of it. Under the ruling of the majority, if the Chancellor's next award does not give effect to all the matters the majority thinks should be given effect, presumably, the only course this Court could take would be a further remand for further proceedings.
It seems far preferable to me for this Court to exercise at this time its clear authority and decide, once and for all, the amount to which this wife is entitled rather than prolong the litigation by a sterile adherence to legal formalism.
With respect to what the amount should be, I am of the opinion that the wife is entitled to an amount that will support her, and no more. She married for money, without love, and by her actions as a wife helped produce the ultimate separation after a childless marriage of a year and a half.[5]
I think $300 per month is sufficient.
The judgment below should be affirmed.
NOTES
[1] The procedural background of this action is set out in an opinion sustaining Chancery jurisdiction. 85 A.2d 724.
[2] While much of the testimony was by stipulation turned over to the Chancellor in transcript form, there was oral testimony on important issues.
[1] Constitution of 1792, Art. VII, § 1; Constitution of 1831, Art. 6, § 7; Constitution of 1897, Art. IV, § 11(1, 4).
[2] 90 A.2d 467; 90 A.2d 468; 87 A.2d 394; 86 A.2d 653; 85 A.2d 724; 82 A.2d 376, 377.
[3] 99 A.2d 252, 253; 98 A.2d 493; 93 A.2d 500, 506; 90 A.2d 476; 79 A.2d 680.
[4] 83 A.2d 105; Anonymous v. Anonymous, Del., 85 A.2d 706.
[5] The ruling of the majority would apparently preclude taking these factors into consideration when fixing the amount of an award for the separate maintenance of a wife who has been "deserted" without legal excuse. But see Collins v. Collins, 182 Okl. 246, 77 P.2d 74; Chapman v. Chapman, 13 Ind. 396; Symington v. Symington, N.J.Ch., 36 A. 21; Lewis v. Lewis, Ky., 239 S.W.2d 465; Puckett v. Puckett, 240 Ala. 607, 200 So. 420; Closz v. Closz, 184 Iowa 739, 169 N.W. 183; and Wilhelm v. Wilhelm, 126 Or. 388, 270 P. 516.