# E. LYDIA GREENWALD v. NORTHERN STATES POWER COMPANY.[1]

May 7, 1948.

No. 34,620.

*Charles H. Weyl,* for appellant.
*Moonan, Sturner & Heinen,* for respondent.

PETERSON, JUSTICE.

Plaintiff had a verdict in a wrongful-death case. Defendant appeals from the judgment after denial of its motion for judgment notwithstanding the verdict.

The questions for decision are: (1) Whether an electric power company is liable for the death of a customer in a rural area caused by his unfastening a guy wire used to support a pole on his land which carried electric wires servicing his farm, and by his permit-

---

[1]Reported in 32 N. W. (2d) 320.

ting it, while he was holding it, to come in contact with the electric wires; and (2) whether, if the preceding question is answered in the affirmative, the customer was guilty of contributory negligence as a matter of law.

On July 27, 1946, decedent was killed by shock caused by electric current transmitted from a high-voltage wire, referred to in the testimony as the "primary" and the "hot" wire, through his body by means of a guy wire which he was holding and which after he had unfastened it came in contact with the hot wire. Decedent and his family lived on a farm which was serviced with electricity by defendant.

In 1940, defendant installed wires carrying 6,900 voltage from its power lines along the public highway to a pole on decedent's land a considerable distance therefrom on which there was a transformer. At the transformer, connection was made with wires carrying much less voltage running to decedent's farmhouse and farm buildings. The wires extended east from the power line to the pole with the transformer and north from the pole to the farmhouse and other buildings. The fact that the pole supported wires on the west and north side made it necessary to install two guy wires, one to the east and the other to the south, to support the pole against the strains and stresses created thereby.

The hot wire was connected to the pole at about 6 inches from the top and about 24½ feet from the ground. About 30 inches below the hot wire was a static or neutral wire, and about 5 to 5½ feet below it was the transformer. A wire called the "primary jumper" extended from the hot wire to the transformer. Except for the primary jumper, all current was carried at a height of 24½ feet above the ground. Where the primary jumper was connected to the transformer the height was 19 or 19½ feet. There was also a ground wire covered by a wooden molding on the side of the pole extending from the neutral wire to the ground, the purpose of which was to make it safe for defendant's employes to work among the wires at the top of the pole. The guy wires were rather heavy cables having 7 heavy wire strands. The south guy wire was attached to the side

of the pole about 2 to 2½ feet from the top and was connected with an anchor in the ground. The east guy wire was attached 1 to 1½ feet from the top of the pole. Connection with the anchor was made by pulling the end of the guy wire through an eye on the end of the anchor and turning the end back against and fastening it to the guy wire a short distance above the eye. This was done by unraveling the wire strands, cutting off 6 of them, and securing the end of the guy wire to the guy wire itself by means of the seventh strand, which was wound around both, and of a clamp held securely by means of three bolts and nuts. A special device was used to stretch the cable and make it taut. The connection so made held the guy wires rigid and made it impossible to disconnect them except by the use of a tool such as a wrench, pliers, or the like. There were no insulators on the guy wires, although they could have been installed at a nominal expense not exceeding a few dollars. If insulators had been installed, decedent would not have received the shock that caused his death.

The construction and maintenance of the wires here were according to the common practice in such situations and were such that no possible harm could come to anyone on the ground as a consequence of touching, bumping, taking hold of, or otherwise coming in contact with the guy wires. The only possible way a person could be injured would have been by disturbing the installation, and this could be done only by deliberately disconnecting the wires by use of a tool, which the evidence here shows was done by decedent with pliers without defendant's knowledge or consent. In the interval between 1940, when the wires were installed, and 1946, when the accident occurred, there was no mishap of any sort, and there was no reason for believing that one was likely to occur.

The evidence showed that in urban areas insulators were used on guy wires, but not in rural regions, as here. The reason given for the use of insulators in urban areas was to protect from harm workmen employed by others in proximity to the wires if they came in contact with them. For a man on the ground (and that included decedent and others in rural areas) there was no need for such pro-

tection, and consequently none was afforded. During the 1940-1945 interval, decedent placed threshing machinery on adjacent land of his neighbor. In 1946 he could not do so because his neighbor had his land in crop. He decided to use some land near the farm buildings for the purpose. Deeming the south guy wire a hindrance to his purpose, decedent determined to remove it. In doing so, he unfastened the guy wire at the anchor end by means of a tool. Then he pulled it out of the eye, which released it and caused it to swing free. While he had hold of it, it came in contact with a hot wire, causing a high voltage of electricity to pass through his body and shock, from which he died.

A distributor of electricity is required to exercise reasonable or ordinary care in the installation, construction, and maintenance of its wires and other apparatus, which means, of course, care commensurate with the dangers involved; but it is not required to guard against harm not reasonably to be anticipated. Schroepfer v. City of Sleepy Eye, 215 Minn. 525, 10 N. W. (2d) 398; Keep v. Otter Tail Power Co. 201 Minn. 475, 277 N. W. 213; Faribault v. Northern States Power Co. 188 Minn. 514, 247 N. W. 680; Neumann v. Interstate Power Co. 179 Minn. 46, 228 N. W. 342; Bunten v. Eastern Minnesota Power Co. 178 Minn. 604, 228 N. W. 332; 2 Dunnell, Dig. & Supp. § 2996; 18 Am. Jur., Electricity, § 53. Ordinary care does not involve forethought of extraordinary peril. As said in Van Leet v. Kilmer, 252 N. Y. 454, 457, 169 N. E. 644, 645:

"* * * The risk must lie within the range of apprehension. * * * No more than reasonable care, however, is required. Every conceivable injury, due to unusual combinations of circumstances to which may be contributed the negligence of the person injured, need not be foreseen."

For example, in Kieffer v. Wisconsin Ry. L. & P. Co. 137 Minn. 112, 162 N. W. 1065, we held that a power company was not bound to anticipate that an employe of a third party would trespass on the roof of a building to remove a coil wire therefrom and be injured by having the wire come in contact with high-tension wires supported on an arm extending out from the top of the building.

In the Keep case, *supra,* we applied the rule where a boy 12 years old climbed a post to unloosen a rope which he had thrown and while attempting to unloosen it received a shock from high-voltage wires which caused severe injuries.

In Troidle v. Adirondack P. & L. Corp. 252 N. Y. 483, 488, 169 N. E. 654, 655, where it was held that an electric company was not liable for injury caused to plaintiff by his throwing a radio aerial wire across its high-voltage wires, the court said:

"* * * We think that, in the situation shown, the defendant owed to the plaintiff no duty of insulating its wires, that he might be protected against the perils of an action, deliberately performed by him, which was so extraordinary and unforeseeable."

In Newark Electric L. & P. Co. v. McGilvery, 62 N. J. L. 451, 41 A. 955 (affirmed, 63 N. J. L. 591, 44 A. 637), it was held that a power company was under no duty to anticipate that workmen employed by a traction company in taking down its feed wire would drop it on and break an electric transmission wire of the power company, and that it was not liable for injuries to a member of the crew engaged in taking down the feed wire. The court said (62 N. J. L. 454, 456, 41 A. 956):

"* * * in this case the wire fell, not because of any act or omission of the company, but because deceased and those associated with him broke it down. Whether the breaking was intentionally done or was produced by negligence or mere accident, the company is in no way responsible to those who broke it for any injury to any of them, at least for any injury which was the direct result of the breaking.

\* \* \* \* \*

"* * * to one who, like deceased, had participated in breaking down and exposing the dangerous wire and who thereafter intermeddled with it, the company owed no duty except to refrain from willful acts to his injury."

Defendant here had not failed to exercise ordinary care to guard against dangers reasonably to be anticipated. The guy wires were

so installed as to involve no danger at all to persons on the ground. That was the full measure of defendant's duty to decedent. No custom with respect to such installations had been disregarded. During a period of six years prior to the accident there was neither danger nor harm to anyone. Only extraordinary meddling and mischief by decedent, which involved not only breach of what must have been the understanding between him and the company that he would not interfere with the installations made by it, but also his violation of M. S. A. 621.33, prohibiting all persons from unfastening such wires, made what was a safe installation dangerous and harmful to him. This defendant was not required to anticipate. "Mischief which could by no reasonable possibility have been foreseen, and which no reasonable person would have anticipated, cannot be taken into account as a basis upon which to predicate a wrong." 38 Am. Jur., Negligence, § 24, note 17. Only prophecy could have previsioned decedent's conduct and the resulting harm to him. No such standard of care was required of defendant.

We do not deem it necessary again to review our prior decisions. In the Schroepfer and other cases cited above, we pointed out that the line of distinction is whether the harm was one which the defendant should reasonably have anticipated; that where reasonable minds might differ with respect to the matter the question of negligence is one of fact for the jury; and that where reasonable minds can be only of the view that the harm was outside the area of reasonable anticipation it follows as a matter of law that there is no negligence. Here, it is plain that defendant could not reasonably have anticipated that decedent would disconnect the guy wires, and, because that was true, it was not guilty of negligence.

Since we have answered in the negative the first question presented for decision, it follows that defendant is entitled to judgment notwithstanding the verdict, and, because that is true, we need not consider the second question.

Reversed with directions to order judgment for defendant notwithstanding the verdict.

Mr. Justice Frank T. Gallagher took no part in the consideration or decision of this case.