HERCULES POWDER COMPANY, a corporation of the State of Delaware, Defendant Below, Appellant, v. IONA M. DiSABATINO, *et al.*, Plaintiffs Below, Appellees.

IONA M. DISABATINO, *et al.*, Plaintiffs Below, Appellants, v. HERCULES POWDER COMPANY, a corporation of the State of Delaware, Defendant Below, Appellee.

*(January* 7, 1963.)

WOLCOTT and TERRY, Justices, and SHORT, Vice Chancellor, sitting.

*David F. Anderson* and *Richard L. McMahon* (of Berl, Potter and Anderson) for defendant-below.

*Samuel R. Russell* and *Peter Warren Green* (of Morford, Young and Conaway) for plaintiffs-below.

Supreme Court of the State of Delaware, Nos. 24 and 25, 1962.

WOLCOTT, J. (for the majority of the Court):

These are cross-appeals by both plaintiffs and defendant in an action which, after trial, resulted in a hung jury. The defendant, Hercules Powder Company appeals from two interlocutory orders of the Superior Court, *viz.*, first, the denial of a motion for a directed verdict for the defendant, and, second, the denial of a motion under Superior Court Rule 50(b), *Del. C.* for judgment for the defendant.

The cross-appeal was taken by the plaintiffs from various adverse rulings made during the course of the trial. The cross-appeal is supported upon the theory that if a second trial is required, instructions from this Court on the disputed questions would assist the trial court and possibly prevent a future appeal.

The action was commenced by a widow for the death of her husband, and by Massachusetts Bonding and Insurance Co., as partial subrogee, to recover the amounts it will be obliged to pay as compensation under the Delaware Workmen's Compensation Law as the insurer carrier for the decedent's employer.

There is no dispute between the parties as to the facts underlying this controversy. We state them briefly.

Hercules is the owner of an electrical power line on its Experimental Station. This line is charged with 12,000 volts of electricity carried in three uninsulated wires, the lowest of which is approximately 11 feet below the top of the pole. The line consists of a series of wooden poles approximately 60 feet high, making an angle in its course. Pole #104 in the

angle is secured by two guys running from the top of the pole to anchors buried in the ground. The power line was constructed in 1952 for Hercules by a contractor in accordance with plans and specifications prepared by Hercules' Engineering Department, which approved and accepted the final installation of the power line.

The power line as designed by Hercules provided for two guys on Pole #104 with two insulators installed in each. One insulator was specified as a wood strain insulator located near the top of the pole, and the second was specified as a porcelain "Johnny Ball" insulator located further down the guy. As actually installed only an 8-foot wood strain insulator was installed in the guys where they were attached to the pole at the top. The contractor constructing the power line called to the Hercules Engineering Department's attention the variance between the plans and the actual installation. This variance was approved and accepted by Hercules.

In 1957 Hercules entered into an agreement with the Levy Court of New Castle County for the construction of a sanitary sewer across the lands of its Experimental Station. Under the terms of the agreement, Hercules granted the Levy Court an easement for such purpose. The sewer to be installed served the Experimental Station and also contained an extension designed to provide sewer service to land not owned by Hercules. Hercules paid the cost of the sewer servicing its Experimental Station, but paid no part of the cost of the extension of the sewer line.

The Levy Court exhibited to Hercules a plan of the proposed course of the sewer, and at Hercules' request relocated the course of the extension line. The relocation of the extension to the sewer brought it in close proximity to Pole #104 of Hercules' power line. Hercules approved of the relocation of the extension.

The Levy Court contracted with DiSabatino Brothers, Inc., the employer of the decedent, for the installation of the proposed sewer line. On the day of decedent's death he and a fellow workman were operating heavy equipment in connection with installing the extension of the sewer line in the vicinity of Pole #104. As they approached the pole they saw the two guys hanging loose from the top of the pole with the loose ends about ten or fifteen feet from the base of the pole. Saying that he would move the wire out of the way, the decedent grasped the guy wire, took two or three steps and fell dead. It was later determined that he died from electrocution.

There is no direct testimony as to how the guy wire below the wood strain insulator became charged with electricity, but plaintiffs' expert witnesses theorized that the decedent moved the wire in such manner as to cause the wire below the 8-foot insulator to come into contact with the lowest high tension wire, located 11 feet from the top of the pole. Hercules does not dispute this surmise.

From subsequent examination, it appeared that the two guy wires of Pole #104 had been cut with a hack saw leaving their anchors firmly imbedded in the ground and the wires dangling loose from the top of the pole. There is nothing in the record to show who in fact cut the guy wire. It seems clear, however, that the decedent probably did not. It is clear, also, that Hercules did not direct that the wires be cut, and that it had no notice that they had been cut. It is further clear that the wires were probably cut in the morning of the day of the accident, or possibly some time during the proceding day, although there is no direct proof as to this.

Expert witnesses were called by both sides to testify as to the proper standards of installation to be followed in the construction of electric power lines. Hercules' engineer who designed and approved the construction of the line testified that the line as constructed complied with the National Elec-

trical Safety Code with respect to the insulation of guy wires. Hercules also called as an expert the Chief Engineer of Delaware Power & Light Company who testified that the guys were properly insulated and conformed to the practice followed by Delaware Power & Light Company, the local electric utility company.

The plaintiffs called two expert witnesses. These experts testified that in their opinion the installation was unsafe because it did not prevent the energizing of the lower part of the guy wide under all circumstances. These experts agreed that the only guide for such installations in general use was the National Electrical Safety Code, and that it was general practice in such installations to follow the pattern established by utility companies in the area.

All the experts were in agreement that, as installed and attached to their anchors, the guys in question were in no wise dangerous, and could not possibly have become energized. Furthermore, from the testimony of all the experts, it is clear that guys installed as these were do not readily become loosened. In fact, such is a rare event and ordinarily occurs only after some unusual weather conditions.

■ Initially, we dispose of two questions presented by the two appeals. Plaintiffs argue that error was committed in permitting Hercules to examine the expert witnesses on the basis of the National Electrical Safety Code since that code was inadmissible in evidence as proof of the standard of installation to be followed.

■ We have no doubt but that safety codes prepared and issued by government agencies are not admissible as independent evidence to prove the truth of the statements or standards contained in them. Annotations, 122 A. L. R. 644, 75 A. L. R. 2d 778. But it has long been permissible to ask on direct as well as on cross-examination an expert witness to state the grounds of his opinions and to detail the general

data which forms the basis of his opinion. *II Wigmore on Evidence*, § 562. This is all that was done in the case at bar. All of the experts admitted knowledge of the Safety Code and recognized it as a guide. The Code, itself, was not offered in evidence. We see nothing improper in basing the examination of an expert witness on such a recognized safety code.

■ Next, Hercules argues that the decedent, at the time he met his death, was a mere licensee, while the plaintiffs contend that he was a business invitee. Upon this basis they urge that Hercules owed different standards of care to the decedent. We think the point to be without much materiality under the facts before us but, in any event, we think the decedent was a person invited or permitted to be on the land of Hercules for a purpose connected with business dealings between Hercules and the Levy Court, of which decedent's employer was an agent. As such, he was a business invitee. *Restatement of Torts*, § 332.

The basic question in the appeal of Hercules is whether or not under the facts of the case Hercules was negligent in the manner in which its high voltage line was installed, and whether, if negligent, that negligence was the proximate cause of decedent's death. Hercules argues that under the facts it was not negligent but exercised due care in the installation of its high tension line. It argues that the issue of its negligence should not have been submitted to the jury. The plaintiffs, on the other hand, argue that it was the duty of Hercules to install guy wires in such fashion that they could under no circumstances ever become charged with electricity. This, it is argued, Hercules failed to do and, accordingly, its negligence was operating at the time the decedent grasped the guy wire and made contact with the high tension wire.

■■ An owner of land who has had erected and maintains on his land a power line of uninsulated wires carrying a high voltage of electricity is under the same duty of safe-

guarding from injury members of the public who may come in contact with it as are electric companies engaged in the transmission of electric current. 29 *C. J. S.* Electricity, § 37. He is liable for injuries from electricity caused by his negligence, but he is not an insurer of the safety of the public. He is bound to know the inherent danger present in electricity and, consequently, is required to exercise a degree of care commensurate with that danger. 29 *C. J. S.* Electricity, § 38; 18 *Am. Jur.*, Electricity, § 48; Annotation, 55 A. L. R. 2d 128; *Cook v. Wilmington City Electric Co.*, 7 Houst. (Del.) 306, 32 A. 643.

■ Due to the latently deadly nature of electricity, a person, either individual or corporate, maintaining a line carrying high voltage electricity is required to provide protection which will safely guard against any contingency, combination of circumstances, or accidents which a person of ordinary intelligence would have foreseen as probable to happen. 29 *C. J. S.* Electricity, § 39; 18 *Am. Jur.*, Electricity, § 48; *Greenwald v. Northern States Power Co.*, 226 Minn. 216, 32 N. W. 2d 320; *International Harvester Co. v. Sartain*, 32 Tenn. App. 425, 222 S. W. 2d 854; *Royal Indemnity v. Midland Counties Pub. Serv. Corp.*, 42 Cal. App. 628, 183 P. 960; *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1, 130 A. 2d 123.

■ The extent of the duty of the landowner to members of the public, and the standard of care he must conform to is measured in terms of the foreseeability of injury from the situation created by him. *Restatement of Torts*, § 302; 18 *Am. Jur.*, Electricity, § 53; *Prosser on Torts* (2d Ed.), § 49. Therefore, in determining whether or not a landowner, in installing and maintaining a high tension line, potentially dangerous, has met the high standard of care demanded of him, the test always resolves itself into the question of whether or not, as a reasonable man, he has provided safely against all reasonably foreseeable acts of others, or combination of acts. Unless the subsequent act of another, or one similar to

it, was to be foreseen at the time when he created the situation, the landowner is not liable. In that event, he is simply not negligent for negligence cannot be predicated upon a failure to anticipate extraordinary and unprecedented acts of others. *Prosser on Torts* (2d Ed.), § 49, pp. 274, 280; 29 *C. J. S.* Electricity, § 51; 18 *Am. Jur.*, Electricity, § 53; *Eldridge, Culpable Intervention as Superseding Cause*, 86 U. of P. L. Rev. 121.

It is impossible to lay down a hard and fast rule as to what acts of others can with certainty be foreseen. Each case is to be decided in the light of its own facts, with due regard to the surrounding circumstances, and whether or not the subsequent act was normal and, so, expectable. *Bohlen, Studies in the Law of Torts*, 504. There must, however, be some limit to liability since the landowner is not an insurer of the safety of the public. This limit is the point where the subsequent act could not reasonably be foreseen as a normal part of the risk created. *Prosser on Torts* (2d Ed.), pp. 274-278.

The question in the case at bar, therefore, is whether Hercules at the time it installed its high tension line should have foreseen that there might be risk of injury to a person lawfully on its premises caused by the cutting of guy wires. It is, of course, not necessary that the precise manner in which the injury was occasioned must have been foreseen; only that injury might reasonably be expected to follow from the situation created.

Did Hercules then take the required precautions in installing its high tension line? Did it foresee all reasonable probabilities? The location of the high tension line on the property of Hercules removed from any public road, the construction of the line in accordance with the safety standards followed by the local utility company, and the fact that as installed the guys were absolutely incapable of becoming ener-

gized, we think, are facts indicating that Hercules was providing safety precautions against foreseeable risks. It is apparent that the precautions taken were sufficient to guard against injury to anyone coming on the location and coming in contact with any part of the line in its installed condition. Unless the installation was disturbed by an outside agency, it was perfectly safe for all.

But plaintiffs argue that Hercules' duty to persons lawfully on its land changed when it granted an easement to construct a sewer and knew that the proposed extension of the sewer ran in close proximity to its high power line. It is argued that it then became the duty of Hercules to warn of the latent danger which could arise if the guy wires were cut.

This, however, is to charge Hercules with the foresight to anticipate that the guy wires would be cut, and that they had to be cut to make way for the contractor's heavy equipment. The difficulty with the argument is that there is nothing in the record to bring home to Hercules knowledge that the guy wires, perfectly safe as long as in place, necessarily would be cut and left dangling from the pole. We would suppose that foresight, if it must be brought into play, would have led to the directly opposite conclusion, *viz.*, that no responsible employee of the contractor would so arbitrarily interfere with an installation carrying the dangerous force of electricity without at least taking steps to make the severed wires safe, or, if no employee of the contractor severed the wires, that no interloper would intrude himself on the scene and deliberately sever the guy wires.

In view of the fact that the testimony is to the effect that guys, rarely, if ever, become loosened, absent an abnormal weather condition, we think an installation providing complete safety when not tampered with discharged Hercules' duty of providing safety against all foreseeable risks. Particularly is this so when the installation followed the

usual pattern followed for such installations by the local utility company. *Heyer v. Jersey Central Power & Light Co.*, 106 N. J. L. 211, 147 A. 452.

We are aware that ordinarily questions as to the foreseeability of a particular risk, the reasonableness of a defendant's conduct, and whether or not an intervening cause is normal or abnormal, are to be submitted to the decision of the jury. When, however, the facts of the cause are not conflicting, and where there can be no reasonable difference of opinion as to the conclusion to be reached upon them, those questions are for the decision of the court as a matter of law. *Prosser on Torts* (2d Ed.), § 49, p. 280; *Restatement of Torts*, § 453, Comment a; *Greenwald v. Northern States Power Co.*, 226 Minn. 216, 32 N. W. 2d 320; *Williams v. City of Sumter*, 149 S. C. 375, 147, S. E. 321; *Stark v. Lehigh Foundries, Inc.*, 338 Pa. 1, 130 A. 2d 123.

In our opinion the nature and cause of the death of the decedent was not foreseeable in the sense that Hercules at the time of the installation of its high tension line was bound in the exercise of due care to provide against it happening in the manner in which it did happen. The decedent met his death as the result of an unforeseeable cause—the cutting of the guy wires and the leaving of them dangling in a position to cause grave injury if moved. Hercules' motion for a directed verdict should therefore have been granted.

This conclusion makes it unnecessary for us to consider the other questions presented by the appeals, including the question of whether or not the decedent was guilty of contributory negligence.

The orders denying Hercules' motions for judgment in its favor are reversed and the cause will be remanded with instructions to enter judgment for Hercules Powder Company.

TERRY, J. (dissenting):

The issues of liability arising on this appeal are as follows:

"(1) Was the defendant free from negligence as a matter of law in the manner in which it constructed the guy wire to its high voltage line?

"(2) If the defendant was negligent in its construction of the guy wire, was it relieved of liability as a matter of law because of the intervening act of an unknown person in cutting the guy wire?

"(3) If the defendant was negligent in the construction of the guy wire, was it relieved of liability as a matter of law because of the contributory negligence of the decedent in grasping the loose end of the wire?"

The majority has rendered moot the issues relating to intervening cause and contributory negligence by holding that the defendant was free from negligence, as a matter of law, in the manner which it constructed the guy wire to the pole. Both sides presented testimony of expert witnesses on the relative merits of this particular construction. As the majority opinion indicates, there was sharp conflict between the testimony of plaintiff's and defendant's experts.

Heedless of this conflict, however, the majority casts itself in the role of a jury and attempts to resolve issues of fact —completely ignoring the long standing rule of this Court that in matters not relating to equity, we must confine our holdings strictly to rulings on the law. We cannot try facts. *Hannigan v. Italo Petroleum Corp.*, 6 Terry (45 Del.) 593, 77 A. 2d 209 (1949); *DuPont v. DuPont*, 34 Del. Ch. 267, 103 A. 2d 234 (1954).

The majority opinion sets forth the conflict of experts, discusses it, and then proceeds to resolve it by the assertion that there is no real conflict because the local custom followed by defendant exonerates it from negligence as a matter of law.

I view that ruling with much concern. It is a noval innovation which for very obvious reasons has no foundation in the law whatsoever. It is elementary that custom cannot change the quality of an act; it can only aid in determining what that quality is. A party cannot by his own continued negligence establish a custom by which he is made exempt from liability, nor is legal responsibility for negligence mitigated by the fact that others have been alike negligent.

The conduct of the defendant in this case is not to be measured by a standard established by it or others, but by a standard fixed by law—that standard is an external one— the degree of care exercised by a reasonably prudent person under like circumstances. To follow a custom shown to be general, uniform and notorious may be the conduct of a reasonably prudent person, or it may not. In any event, such an issue presents a factual situation for jury determination. *State of Delaware to Use of Henderson v. Clark*, 2 Terry 246, 20 A. 2d 127 (1941).

In a case, closely related on its facts, and identical to the issues raised by the defendant here, a New Jersey Court has ruled:

"The general custom of the industry, although evidential as to what is the reasonable standard in an industry, does not conclusively establish the care a public utility must exercise in performance of its operations. Adherence to an industry standard is not necessarily conclusive as to the issue of negligence and does not of itself absolve the defendant from liability. * * * The defendant must still use reasonable care under all the circumstances and if the prevailing practices in the industry do not comport to that standard, the defendant may be found negligent notwithstanding compliance with industry custom." *Buecafusco v. Public Service Elec. & Gas Co.*, 49 N. J. Super. 385, 140 A. 2d 79 (1958).

It seems to me that the law is so universally clear on

this subject that a further discussion of it would be unnecessary.

It is my conclusion that Issue (1), *supra*, relating to proper construction in the light of a foreseeable risk of harm to others presents a question that cannot be resolved by this Court under the present state of the record. The question is one for jury determination under adequate instructions.

Necessity does not require that I set forth a detailed discussion of Issues (2) and (3), *supra*. It will suffice to say that in my opinion each issue presents a question for jury determination under adequate instructions.