899 So.2d 975 (2004)
ALABAMA POWER COMPANY
v.
David MOORE.
1021937.
Supreme Court of Alabama.
September 3, 2004.
Rehearing Denied October 22, 2004.
*977 Teresa G. Minor and Ed R. Haden of Balch & Bingham, LLP, Birmingham; Sterling G. Culpepper, Jr., of Balch & Bingham, LLP, Montgomery; and Walter E. McGowan of Gray, Langford, Sapp, McGowan, Gray & Nathanson, Tuskegee, for appellant.
R. Graham Esdale, Jr., and LaBarron N. Boone of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery; and Lynn W. Jinks III and Christina D. Crow of Jinks, Daniel & Crow, P.C., Union Springs, for appellee.
WOODALL, Justice.
Alabama Power Company ("APCo") appeals from a judgment entered on a jury verdict, awarding David Moore compensation for injuries he sustained when he came into contact with an electrified guy wire, as well as punitive damages. We reverse and remand.

I. Factual Background
On the evening of February 25, 2001, Moore drove his automobile to a restaurant in Montgomery. He found a marked parking space at the edge of the pavement of the parking lot of the restaurant. However, because there was no curb at the edge of the parking lot, Moore drove his car a few feet beyond the edge of the pavement onto a flat, grassy area. He left the car and went into the restaurant.
After dining, Moore returned to his car. In attempting to drive out of the parking lot, however, he noticed for the first time that his car was stuck on something. Upon inspection, Moore discovered that he had inadvertently parked the car atop the anchored end of an unmarked guy wire, which supported an electrical pole owned and maintained by APCo, and that his car was hung on the guy wire. Using his own hand tools, Moore broke the guy wire from its anchor. Loosed from its anchor, the guy wire sagged and touched an electrified "stinger wire" that ran a few inches beneath the guy wire near the top of the electrical pole. Moore was electrocuted when the electricity conducted by the stinger wire traveled down the guy wire while Moore was holding the guy wire in his hand.
Moore sued APCo and others, alleging negligence and wantonness, and a jury trial began on April 21, 2003.[1] At the close of all the evidence, APCo moved for a judgment as a matter of law ("JML"). More specifically, it contended that Moore was guilty of contributory negligence as a matter of law for breaking the guy wire. It further contended that the intentional destruction of the guy wire was unforeseeable and that Moore's conduct constituted an intervening cause, which broke the chain of proximate causation. The trial court denied the motion and submitted the negligence and wantonness claims to the jury. The jury awarded Moore $1,000,000 compensatory damages and $2,000,000 punitive damages. The trial court entered a judgment in favor of Moore in the amount of $2,200,000[2] and denied APCo's renewed motion for a JML, a remittitur, or, in the alternative, a new trial. APCo appealed, contending that the trial court erred in denying its motion for a JML.

II. Standard of Review
The standard of review of the denial of a motion for a JML is well established:

*978 "`[T]he Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present "substantial evidence" in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).'"
Johnson v. Stewart, 854 So.2d 544, 546-47 (Ala.2002) (quoting Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala.1999)).
APCo does not contend that it was not negligent in its maintenance of the electrical pole and the guy wire. Instead, APCo argues that Moore's injuries proximately resulted, not from APCo's negligence, but from Moore's intentional, unforeseeable breaking of the guy wire. APCo argues that "Moore's intentional breaking of the guy wire constitutes an independent, intervening act that severs the chain of proximate causation and requires a [JML] for APCo on the wantonness and negligence claims." APCo's brief, at 39.

III. Proximate Cause
At the outset, we note that Moore suggests no theory of his own as to how the guy wire broke, and his brief is ambivalent regarding the extent of his role in breaking it. However, the testimony he presented at trialMoore's own testimony and that of his expertwas clear and undisputed.
The guy wire was composed of six strands of galvanized wire braided to form a cable. Attached to the bottom of the cable were three strands of galvanized wire, several inches long. These three strands were looped through the "eye" of the guy-wire anchor to form a "preformed guy grip" ("the grip"). The anchor was implanted in the ground. Thus, the guy wire was connected to the anchor by the three strands of the guy grip.
Moore's expert witness, Roger Bybee, testified that, based on his examination of the guy grip, it was his opinion that Moore had used his hand tools to break "two, if not all three, of the strands of the preformed guy grip." Indeed, Moore testified that he intentionally bent the wires forming the guy grip with his hand tools until the wires broke and that he admitted to rescue workers and medical personnel who arrived on the scene the night of the accident that he had broken the wires. Viewing the facts in the light most favorable to Moore, the testimony and exhibits conclusively establish that Moore broke the guy grip while attempting to free his car from the guy wire, causing the guy wire to sag and touch the electrified "stinger wire." Moore offered no evidence indicating that the guy grip was damaged when he inadvertently parked his car atop the anchored end of the guy wire. Thus, the dispositive *979 issue is whether Moore's breaking of the guy grip was foreseeable as a matter of law.
"`The proximate cause of an injury is that cause which, in the natural and probable sequence of events, and without the intervention or coming in of some new or independent cause, produces the injury, and without which the injury would not have occurred.'" Hicks v. Vulcan Eng'g Co., 749 So.2d 417, 424 (Ala.1999)(quoting trial court's jury charge). "[I]f a new, independent act breaks the chain of causation, it supersedes the original act, which thus is no longer the proximate cause of the injury." Riojas v. Grant County Pub. Util. Dist., 117 Wash.App. 694, 697, 72 P.3d 1093, 1095 (2003). "[A]n [act] is superseding only if it is unforeseeable. A foreseeable intervening [act] does not break the causal relationship between the defendants' actions and the plaintiffs' injuries." Kelly v. M. Trigg Enters., Inc., 605 So.2d 1185, 1190 (Ala.1992) (emphasis added).
"Ordinarily, it is a jury question whether consequences of an act are reasonably foreseeable, but, in a proper case, it is a legal question." Sly v. South Cent. Bell Tel. Co., 387 So.2d 137, 140 (Ala.1980). "When ... the facts of the cause are not conflicting, and where there can be no reasonable difference of opinion as to the conclusion to be reached upon them, those questions are for the decision of the court as a matter of law." Hercules Powder Co. v. DiSabatino, 55 Del. 516, 527, 188 A.2d 529, 535 (1963). "`[F]oreseeability must be based on the probability that harm will occur, rather than the bare possibility.'" Ex parte Wild Wild West Soc. Club, Inc., 806 So.2d 1235, 1241 (Ala. 2001) (quoting 65 C.J.S. Negligence § 4(3) (1966)(emphasis added)).
"[T]he line is drawn to terminate the defendant's responsibility" for injuries of the unanticipated sort resulting from "intervening causes which could not reasonably be foreseen, and which are no normal part of the risk created." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 44, at 312, 311 (5th ed.1984). Among those injuries are those that result from "intentional or criminal acts against which no reasonable standard of care would require the defendant to be on guard," such as the "destructive meddling with property." Id. at 313 (emphasis added).
Neither party has cited a case directly on point. However, DiSabatino, supra, cited by APCo, supports APCo's position. In that case, a worker who was installing a sewer line near a power pole owned and maintained by Hercules Powder Company ("Hercules") was electrocuted when he picked up one of two guy wires that had been deliberately cut away from its anchor by an unknown third party. 55 Del. at 521, 188 A.2d at 532. In an action by the worker's widow against Hercules, the Delaware Supreme Court concluded that, although Hercules knew that construction workers were operating near the power pole, "the cutting of the guy wires" was "an unforeseeable cause," which Hercules was not "bound in the exercise of due care to provide against it happening," and held that Hercules was entitled to a directed verdict and "judgment in its favor." 55 Del. at 527, 188 A.2d at 535. The court explained: "We would suppose that foresight... would have led to the ... conclusion... that no interloper would intrude himself on the scene and deliberately sever the guy wires." 55 Del. at 526, 188 A.2d at 535. It concluded: "In view of the fact that the testimony is to the effect that guys rarely, if ever, become loosened, absent an abnormal weather condition, we think an installation providing complete safety when not tampered with discharged *980 Hercules' duty of providing safety against all foreseeable risks." Id. (emphasis added).
The testimony in this case regarding the infrequency of guy-wire separation was similar to the testimony in DiSabatino. Although APCo conceded that a guy wire can, and occasionally does, break through human agency, Gerald Azar, a lineman for APCo, testified that it is "an uncommon occurrence" for a guy wire to become "detached from the anchor." Frederick Brooks, a witness tendered by APCo as an expert in the field of "forensic engineering," testified:
"Q. [By APCo's counsel] In your judgment or opinion, was it foreseeable to a utility such as Alabama Power that someone would take tools like this, break loose its guy wire, vandalize its equipment, and cause the guy wire to spring back into the pole?
"A. [By Brooks]. No, sir. Nobody is going to foresee that someone is going to go in and take tools and try to basically cut a guy wire. That's almost unheard of. In fact, I've never heard of it happening."
(Emphasis added.)
Foreseeability is not based on "bare possibilit[ies]." Ex parte Wild Wild West Social Club, Inc., 806 So.2d at 1241. APCo could not reasonably have foreseen the kind of harm that resulted from the intentional destruction of its equipment, the breaking of the guy grip being no more than a "bare possibility." Thus, we hold that the intentional conduct of Moore, who manually bent, and ultimately broke, the wires of the guy grip while attempting to remove the wire from beneath his automobile, superseded any alleged negligence or wantonness of APCo.

IV. Summary
For the foregoing reasons, the trial court erred in denying APCo's motion for a JML. The judgment is, therefore, reversed, and this cause is remanded for the entry of a judgment in favor of APCo.
REVERSED AND REMANDED.
NABERS, C.J., and HOUSTON, SEE, LYONS, HARWOOD, and STUART, JJ., concur.
JOHNSTONE, J., dissents.
JOHNSTONE, Justice (dissenting).
Plaintiff Moore's explanation of his ultimate goal in manipulating the guy wire was:
"I felt as though I could get it from under there and over and off. I felt I could get it off."
His testimony to the effect that, while pursuing this goal, he unintentionally broke what was left of the guy grip strands, the strands connecting the guy wire to its anchor, follows:
"Q. [Plaintiff's attorney:] David, you've already [alluded] to this; but describe to the jury the appearance of the guy wire when you saw it underneath your car.
"A. After seeing it the first time and then backing forward and reversed on it a few times, it had become worse. So it was more bunched up. The wires that were broken, some were in the top of the wall of the tire. One or two of those that had become disconnected were they appeared they were going to pop the tire.
"So my concern then was I was going to pop my tire before I could get it off. So I was trying to get those wires back off so I could proceed to try to get it off without busting the tire.
"Q. Are you saying that some of the wires had already broken?

*981 "[Defense attorney]: Object to leading.
"A. Some of the wires had already come loose. They looked worn and were
"[Defense attorney]: Objection, Your Honor.
"THE COURT: Just describe what you saw.
"Q. Let's move on, David. What did you do with the tools with respect to that wire.
"A. At first I'm pretty positive I used the red pliers first just to simply shift the wire, bend back the endsthe pieces I could get to. And at some point, you know, I would set the pliers down and hold the wirethis hand on the carand was pulling, this and that. And then I picked up the vise grips and then I moved another wire with that, shift the wire around some more, put the tool down, move the wire some more. Where in turn, this hand was pretty much on the car bracing myself. I felt as though I could get it from under there and over and off. I felt I could get it off.
"Q. And then what happened?
"A. It broke. It came disconnected in some fashion at that point. And that was it.
"Q. David, were you trying to cut that guy wire in two?
"A. No, sir.
"Q. What do you think happenedLet me ask the question like this: Do you think the guy wire did come in two in some fashion while you were working with it to try and get it off of your tire and car?
"A. Yes, sir, definitely.
"....
"Q. Okay. While we're locating that, David, I want to ask you looking at that picture, either on the left or the right, tell the jury what part of the guy wire you started working on with your tools at first.
"A. Pieces that look like the one on the right that are loose. Those ends were into the rubber and the wall and the top of the tire. I was bending those back. They had become pushed into there, and I was bending those back to prepare to try to get that wire off again. So I felt as though I was going to have a flat tire first. And then I set the tools down, worked with it, did some more bending them back. And then kapow."
Plaintiff Moore expressly denied that he cut the guy wire:
"It broke. But I did not cut it."
Testimony tending to prove that plaintiff Moore's injury was foreseeable follows:
Testimony of Leonard Caldwell, a troubleshooter with Alabama Power Company and an adverse witness:
"Q. [Plaintiff's attorney:] Mr. Caldwell, are you aware of occasions where guy wires have become detached from their anchors?
"A. Yes.
"Q. And that is some of the things you are called out to fix as a troubleshooter, is it not?
"A. Yes.
"Q. In fact, that occurs on a regular basis, does it not?
"A. It happened.
"Q. And you have actually seen guy wires broken where the strands of the guy grip go through the anchor, haven't you?
"A. Broken where? Say that again.
"Q. Broken where the guy grip goes through the anchor. You have seen it broken there, haven't you?
"A. Yes."

*982 Testimony of Jeffrey Wayne Haynes, a lineman with Alabama Power Company:
"Q. [Plaintiff's attorney:] Is it your understanding that even with a grounding wire that should that guy wire touch that stinger wire, that electricity is going down that guy wire?
"A. It is going to be a possibility.
"Q. Well, it happens, doesn't it?
"A. It happens.
"Q. Whereas if you've got an insulating rod on it, it's not going to go down there, is it?
"A. No, sir. But the principle is it is going to take it out and it is going to knock out the system.
"Q. And for it to do that, isn't it correct that before that fault is triggered, that current is going to have to get to ground and it is going to go through the guy wire before the fault ever triggers?
"A. Yes, sir. And in the instance that your client cut the guy wire, that's what happened.
"Q. Well, let me ask you this: Guy wires don't have to be cut before they are going to touch an insulated line and power is going to go down to the base, do they?
"A. No, sir.
"Q. And that's happened before, hasn't it?
"A. I've he[a]rd that it has, yes, sir.
"Q. You know that guy wires come undone, don't you?
"A. Yes, sir.
"Q. And let me ask you this: What information do you have that Mr. Moore cut the guy wire?
"A. The guy wire was properly installed to start with. It had to have been disattached somehow.
"Q. Well, they just come loose, don't they?
"A. They have been known to, yes, sir.
"Q. So what information do you have that Mr. Moore cut that?
"A. I really don't have any.
"....
"Q. Let me ask you this, too: When you are talking about the amount of current involved in this case and the distribution lines and stinger lines, that is enough current even in a short period of time to cause death or serious injury, isn't it?
"A. Yes, sir.
"Q. And you have admitted you know even with a grounding system, assuming it is working right, that current is going to travel down that guy wire before that circuit faults, isn't that correct?
"A. I don't know for a fact that it will. I mean, the system is made to lock out.
"Q. And it's got to get to the ground before it will do that, doesn't it?
"A. Yes, sir.
"Q. So it's got to get down that wire, doesn't it?
"A. Get down the pole attached to the ground wire.
"Q. Let me ask you this: Would you agree with Mr. Foster that in the grounding systemDo you know Mr. Clint Foster?
"A. Yes, sir.
"Q. And would you agree with him that that grounding system is going to allow current to go down that guy wire?
"A. Possibility, yes, sir.
"Q. And when somebody comes in contact with it, they are going to get seriously injured or killed?
"A. Yes, sir.
"Q. And with the insulate or rod, it is not going to happen?

*983 "A. Wouldn't be as likely.
"....
"Q. Well, let me go back and ask you then real quick just to recap: Now, you have seen a lot of configurations where an uninsulated stinger is run underneath an uninsulated guy wire, is that correct?
"A. I've seen instances, yes.
"Q. And you said it is common?
"A. Yes, sir. It happens. It's out there.
"Q. Now, something else you have knowledge of; and that is that guy wires for whatever reasongetting hit, getting bumped, or something just on their owncome loose from anchors, don't they?
"A. Yes, sir, they do.
"....
"Q. Tell the ladies and gentlemen of the jury based on your knowledge, training, and experience as an Alabama Power Company lineman what a guy wire that comes undone from its anchor is going to do when it's run over an uninsulated stinger carrying 7,200 volts.
"[Defense attorney]: Objection, Your Honor.
"THE COURT: He can answer that if he knows.
"A. There's a grip that's tied at the top of the pole that's stiffer than the guy. So that's double stiffness there. It could sit there and not ever come in contact with the stinger, or it could drop down into it. It's not necessarily going to drop down every time.
"....
"Q. If a guy wire touches 7,200 volt uninsulated stinger, what's going to happen?
"A. The primary will conduct to the ground.
"Q. And if there's a person touching the guy wire, what's going to happen?
"[Defense attorney]: Objection.
"THE COURT: He can answer that if he knows.
"A. It's going to come in contact with it.
"Q. And it is going to cause serious injury or death, isn't it?
"[Defense attorney]: Objection.
"A. Possibly.
"....
"Q. What kind of training have you been given at Alabama Power as to what would happen, if anything, to you if you touch 7,200 volts?
"A. We're taught to cover it up and not to touch it.
"Q. Did anybody ever tell you why?
"A. It could be a fatal accident or you could be burned, yes, sir.
"Q. Burned badly?
"A. Yes, sir. I assume so."
Testimony of Gerald Azar, a lineman with Alabama Power Company:
"Q. [Plaintiff's attorney:] For the years that you've been a lineman, Mr. Azar, have you known of cases where guy wires have come loose from their anchors?
"A. Yes, sir.
"Q. In fact, that happens sometimes just because of the passage of time, doesn't it?
"A. Possibly, yes, sir.
"Q. In fact, sometimes you've observed where the guy wires and guy grips have rusted out causing guy wires to become detached from the anchor?
"A. Yes, sir. That has happened.
"Q. And in addition to that, guy wires can get struck by machinery or cars and come loose in that fashion?
"A. Yes, sir.

*984 "....
"Q. Guy wires coming detached from the anchor is not an uncommon occurrence, is it?
"A. It is an uncommon occurrence.
"Q. It does happen?
"A. Yes, sir, it does happen.
"Q. It happens frequently enough to where sometimes you're called to get involved and fix it back?
"A. Usually there's a reason why it comes loose.
"Q. And those are the reasons that you've told me about?
"A. Some of them.
"Q. There are other reasons?
"A. Cars, vandalism, people in general.
"Q. People in general?
"A. Cutting them."
Testimony of Clint Foster, an electrical engineer and the corporate representative for Alabama Power Company:
"Q. [Plaintiff's attorney:] Are you here today and throughout this trial as Alabama Power Company's corporate representative?
"A. Yes, sir.
"Q. And you are here to represent the power company?
"A. Yes, sir.
"Q. You understand generally that the accident which resulted in these injuries to David Moore occurred because the guy wire become loose from its anchor?
"A. That's correct.
"[Defense attorney]: Object to the form unless you elaborate how it came loose. That is an incomplete question
"[Plaintiff's attorney]: Well, that's the way I want to phrase it.
"Q. Generally it became unattached from the anchor; would you agree with that?
"A. For the reasons that I understand and I believe how it become unattached from the anchor, yes, sir.
"Q. And you say Mr. Moore cut and broke it and caused it to come undone?
"A. I think he manipulated the wires, yes, sir.
"Q. It doesn't matter to you, does it, Mr. Foster, as an electrical engineer how the guy wire comes undone; your job is to do everything reasonably possible to prevent electricity from running down the guy wire to the ground?
"A. That's correct.
"Q. And keeping electricity away from the ground is a safety concern; would you agree with that?
"A. Sure.
"Q. And that's something that the Alabama Power Company undertakes to do?
"A. Sure.
"Q. And you would agree, would you not with what your linemen, Mr. Azar and Mr. Caldwell, said a couple of days ago that providing for the safety of the public is Alabama Power Company's most important job?
"A. That's correct.
"Q. And would you agree with me that 7200 volts running down the guy wire to the ground is an extreme hazard to human life and safety?
"A. Any voltage.
"Q. And that extreme hazard is most likely to occur if the guy wire for whatever reason comes loose from the anchor?
"A. It would be only momentarily, I think. It is grounded and there is protection in place that's designed to momentarily, almost instantaneously kill the power once that happened.

*985 "Q. In any case, any contact with that kind of voltage by a human being could result in very serious injuries?
"A. Sure. In that case or however it may happen.
"Q. However it may happen. And wouldn't you agree with me that it is foreseeable to the Alabama Power Company that guy wires come loose from their anchors?
"A. Guy wires do come loose from their anchors for a number of reasons.
"Q. And that is foreseeable to the power company?
"A. We know that it can happen.
"....
"Q. You don't have to have a crystal ball to tell you that guy wires are going to become detached from their anchors, do you?
"A. No, I don't have a crystal ball to see that.
"Q. You know that happened in the past, and you know it is going to happen in the future?
"A. Sure.
"Q. And it doesn't make any difference to you as an electrical engineer from a safety point of view how that happens; your job is to guard against an extreme hazard (inaudible); is that your testimony?
"A. It can happen and we do our best to guard.
"Q. And you admitted in this case in this configuration, in this situation, that the insulating method is safer than the grounding method?
"[Defense attorney]: Your Honor, that's an incomplete statement.
"THE COURT: He can answer.
"Q. In this situation.
THE COURT: He can answer that.
"A. The fiberglass rod is safer in preventing current. I can give you another example at the same pole where having a grounded guy would be more beneficial.
"Q. Your expert, Mr. Brooks talked a good bit about how safe your grounding method was. It wasn't safe enough to prevent Mr. Moore from injury, was it?
"A. No. He received some injuries from this.
"Q. And if the insulating method had been used, Mr. Moore would not have received those injuries, would he?
"A. That, in addition to some other factors, he would not have become injured."
Testimony of Roger Bybee, plaintiff Moore's expert electrical engineer:
"Q. [Plaintiff's attorney:] Let me show you paragraph 6 here.
"If you would, look right there and there is a requirement that says if the guy insulator were hanging straight down the pole.
"A. Yes, sir. In fact, that says guy strain insulators must be installed so that the lower metallic end fitting would be at least 12 inches below any primary phase orand at least 12 inches below any secondary hot leg if the guy insulator were hanging straight down the pole. That is if the guy were completely loose and against the pole. And that is actually the same that was on your prior Exhibit 149. That was note 5. And this is an '88 note.
"Q. Does that indicate to you that folks know anchorsguys are going to come loose from the anchors?
"[Defense attorney]: Objection, Your Honor.
"THE COURT: Sustained.
"Q. Again, based on your experienc[e] and training as an electrical engineer, *986 not Alabama Power Company's reason, but yourself, what would be the reason for that?
"A. Because guys come loose for a variety of reasons. They come loose from the anchors and in that situation it is foreseeable that it can go up close to the pole. And part of all of this, this entire concept is that the only reason a utility company or anyone else is allowed to use uninsulated high voltage conductors up there is if they are isolated by elevation, that is out of harm's way and there is no way to broach or to breach that insulation or that isolation by elevation.
"Q. When you have a long metallic conductor that goes from the ground up to the area of the energized wires that don't have any insulation on them?
"A. That is the entire purpose for the kinds ofand in particular note six on this particular exhibit and for the use of uninsulated wires and using insulated down guys."
The main opinion correctly acknowledges:
"`"In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996)."'"
899 So.2d at 978 (quoting Johnson v. Stewart, 854 So.2d 544, 547 (Ala.2002), quoting in turn Delchamps, Inc. v. Bryant, 738 So.2d 824, 830-31 (Ala.1999)). While plaintiff Moore is obviously a self-help personality, America is, fortunately, chock-full of self-help personalities. The evidence, viewed in the light most favorable to the plaintiff Moore, the nonmovant, supports the conclusion that the entanglement of his car in the unguarded, unmarked guy wire at the very edge of the parking lot, his efforts to free his car from the guy wire, the eventual parting of the guy grip strands, and his consequent electrocution were all reasonably foreseeable to the defendant Alabama Power Company. Therefore, I respectfully submit that this defendant was not and is not due a judgment as a matter of law on the theory of independent intervening cause.
NOTES
[1] During the trial, Moore settled with all the defendants except APCo. Therefore, this appeal involves no issues or claims other than those against APCo.
[2] The $800,000 reduction in the judgment from the amount of the verdict reflected a credit for the amount of Moore's settlement with the other defendants.